17-1162-cv
*D'Addario v. D'Addario, et al.*

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

———

August Term, 2017

(Argued:  October 31, 2017      Decided:  August 14, 2018)

Docket No. 17-1162-cv

———

VIRGINIA A. D'ADDARIO, individually, and on behalf of the F. Francis
D'Addario Testamentary Trust and the Virginia D'Addario Trust; and
VIRGINIA A. D'ADDARIO, EXECUTRIX, as Executrix of the Probate Estate of
Ann. T. D'Addario, Deceased, and on behalf of the F. Francis D'Addario
Testamentary Trust and the Ann T. D'Addario Marital Trust,

*Plaintiffs-Appellants*,

–v.–

DAVID D'ADDARIO, MARY LOU D'ADDARIO KENNEDY, GREGORY S. GARVEY,
RED KNOT ACQUISITIONS, LLC, SILVER KNOT, LLC, NICHOLAS VITTI,

*Defendants-Appellants*.[*]

———

B e f o r e :

LYNCH and CARNEY, *Circuit Judges*, and HELLERSTEIN, *District Judge*.[†]

———

[*] The Clerk of Court is directed to amend the caption to conform to the above.

[†] Judge Alvin K. Hellerstein, of the United States District Court for the Southern District of New York, sitting by designation.

Virginia D'Addario appeals the dismissal of her claim brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, against her brother, David D'Addario; her sister, Mary Lou D'Addario Kennedy; Gregory Garvey; Nicholas Vitti; Red Knot Acquisitions, LLC; and Silver Knot, LLC. Virginia's claim, which she asserts both individually and as Executrix of her mother's estate, arises out of the management of her father's probate estate (the "Estate") over several decades by her brother David.

Virginia's father, Connecticut resident and entrepreneur F. Francis D'Addario, died unexpectedly in 1986 and bequeathed his fortune—once estimated to have a net value above $111 million—to his wife and their five children. Virginia's youngest brother, David, has been an Executor of the Estate since their father's death. Since then, she alleges, he has systematically looted the assets of the Estate, with the active assistance of their sister Mary Lou and David's friends Nicholas Vitti and Gregory Garvey, and by means of two corporate entities formed by David and Garvey. Virginia contends that the Estate—which has remained open in Connecticut Probate Court for more than thirty years—is now insolvent and that, because of Defendants' actions, neither she nor her mother's estate will receive any portion of the multi-million-dollar inheritance to which they were entitled. Virginia seeks damages based on two types of injury: the loss of the inheritance they would have received if not for David's fraudulent schemes and the approximately $200,000 in legal expenses that she has incurred in the course of Connecticut state court proceedings in which she sought to remove David as Executor. The United States District Court for the District of Connecticut (Arterton, *J.*) dismissed her complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, and declined to exercise supplemental jurisdiction over related state law claims.

We conclude that: (1) Virginia's claim for distribution of her inheritance and that of her mother's estate is not ripe under RICO because the Estate is not closed and the amount of the lost inheritance is too speculative; (2) her claim under RICO for legal expenses incurred in pursuing her grievances against David and other defendants is ripe; (3) she has plausibly alleged that her legal expense injuries were proximately caused by Defendants' RICO violations; (4) she has adequately pleaded that David, Garvey, and Red Knot violated 18 U.S.C. § 1962(b); and (5) she has adequately pleaded that all six defendants violated 18 U.S.C. § 1962(c). Accordingly, we VACATE the District Court's judgment dismissing in full Virginia's RICO claim and related state law

claims both as brought on her own behalf and as Executrix, and we REMAND the cause for further proceedings in accordance with this opinion.

VACATED AND REMANDED.

———————

F. DEAN ARMSTRONG (Edward C. Taiman, Jr., Sabia Taiman, LLC, Hartford, CT, *on the brief*), Armstrong Law Firm PC, Frankfort, IL, *for Plaintiffs-Appellants*.

ALFRED U. PAVLIS (Tony Miodonka, *on the brief*), Finn Dixon & Herling LLP, Stamford, CT, *for Defendants-Appellees David D'Addario, Mary Lou D'Addario Kennedy, Silver Knot, LLC, and Nicholas Vitti.*

NATHAN BUCHOK (Brian E. Spears, *on the brief*), Spears Manning LLC, Southport, CT, *for Defendants-Appellees Gregory S. Garvey and Red Knot Acquisitions, LLC.*

———————

SUSAN L. CARNEY, *Circuit Judge*:

Virginia D'Addario appeals the dismissal of her claim brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, against her brother, David D'Addario; her sister, Mary Lou D'Addario Kennedy; Gregory Garvey; Nicholas Vitti; Red Knot Acquisitions, LLC; and Silver Knot, LLC. Virginia's claim, which she asserts both individually and as Executrix of her mother's estate, arises out of the management of her father's probate estate (the "Estate") over several decades by her brother David.

Virginia's father, Connecticut resident and entrepreneur F. Francis D'Addario, died unexpectedly in 1986 and bequeathed his fortune—once estimated to have a net

value above $111 million—to his wife and their five children. Virginia's youngest brother, David, has been an Executor of the Estate since their father's death. Since then, she alleges, David has systematically looted the assets of the Estate, with the active assistance of her sister Mary Lou, David's friends Nicholas Vitti and Gregory Garvey, and by means of two corporate entities formed by David and Garvey. Virginia contends that the Estate—which has remained open in Connecticut Probate Court for more than thirty years—is now insolvent and that, because of Defendants' actions, neither she nor her mother's estate will receive any portion of the multi-million-dollar inheritance to which they were entitled. Virginia seeks damages based on two types of injury: the loss of the inheritance they would have received if not for David's fraudulent schemes and the approximately $200,000 in legal expenses that she has incurred in the course of Connecticut state court proceedings in which she sought to remove David as Executor. The United States District Court for the District of Connecticut (Arterton, *J.*) dismissed her complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, and declined to exercise supplemental jurisdiction over related state law claims.

We conclude that: (1) Virginia's claim for distribution of her inheritance and that of her mother's estate is not ripe under RICO because the Estate is not closed and the amount of the lost inheritance is too speculative; (2) her claim under RICO for legal expenses incurred in pursuing her grievances against David and other defendants is ripe; (3) she has plausibly alleged that her legal expense injuries were proximately caused by Defendants' RICO violations; (4) she has adequately pleaded that David, Garvey, and Red Knot violated 18 U.S.C. § 1962(b); and (5) she has adequately pleaded that all six defendants violated 18 U.S.C. § 1962(c). Accordingly, we VACATE the

4

District Court's judgment dismissing in full Virginia's RICO claim and related state law claims both as brought on her own behalf and as Executrix, and we REMAND the cause for further proceedings in accordance with this opinion.

**BACKGROUND**[1]

**I.      Francis's death and David's management of the Estate**

F. Francis "Hi Ho" D'Addario ("Francis"), a successful Connecticut businessman and the head of D'Addario Industries, died unexpectedly in early 1986, the victim of an airplane crash. At the time of his death, his net worth was estimated to exceed $111 million. He was survived by his wife, Ann, and their five children: in order of birth, Virginia, Larry, Mary Lou, Lisa, and David.

Shortly after the accident, Francis's will (the "Will") was filed for probate in the Probate Court of Trumbull, Connecticut. That court appointed Francis's two sons, David and Larry, to serve with three non-family members as Executors of the Estate.[2] At the time of his appointment, David, the youngest of the five D'Addario siblings, was 24 years old and had been working for his father's business. As an Executor, David was suddenly able to exert significant control over the entirety of the business empire

---

[1] In reviewing the District Court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "we accept as true all facts alleged in the Complaint, drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). We therefore state the facts here as pleaded in the First Amended Complaint ("Complaint"). We express no view as to their accuracy.

[2] The appointments of the three non-family members ended over time. David and Larry have been the Estate's sole executors for roughly the last 15 years.

known as D'Addario Industries: substantially all of his father's business assets lay within the Estate.

The Will provided that one-half of Francis's assets would be placed into a marital trust for the benefit of his wife, Ann D'Addario ("Ann"); the other half would be divided equally among their five children. The anticipated distributions, however, have never been made. When the District Court dismissed Virginia's Complaint in March 2017, more than thirty years after Francis's death, his Estate remained open in the Connecticut Probate Court, and the record before us reflects no change since then.

The extensive passage of time has had a significant impact on the siblings' respective expectations regarding their inheritances, both because of the extensive transactions undertaken by David, as described in the Complaint, but also because, under the terms of the Will, if any of the five children predeceases the others while the Estate is still open, the deceased child's interests return to the Estate for pro rata distribution to the remaining siblings. Thus, in 1990, when Lisa D'Addario died, her interest as legatee passed back to the Estate in accordance with the Will's provisions.[3]

---

[3] Francis's wife, Ann, also died in the interim between Francis's death and the filing of this suit, but her interest by way of the marital trust has not devolved to the Estate; rather, Ann's own estate remains entitled to one-half of Francis's Estate. Virginia is Executrix of her mother's estate. In this suit, Virginia asserted identical RICO and state law claims on behalf of Ann's estate as well as on her own behalf as a legatee under Francis's Will and on behalf of several trusts. Thus, in its opinion dismissing the First Amended Complaint, the District Court uses "Plaintiffs," in the plural, to describe the parties seeking relief. In this opinion, we refer simply to "Virginia" when discussing the proponent of the claims at issue on appeal, as no party has asserted any material difference between Virginia individually, and Virginia as Executrix, as claimants and legatees.

In late 1987, Virginia obtained an advance from the Estate toward her distributional interest. The advance took the form of a non-recourse loan to her in the amount of $3.9 million, and was documented by a promissory note. In exchange for permitting the advance, David extracted a promise from Virginia (as Virginia acknowledges) that she would no longer "participate in or take part in Estate deliberations or decisions as regards the Estate or its property," and that she would waive "all rights . . . in her favor against the Executors as regards their administration of the Estate and the validity of their decisions, . . . except for willful fraud, malfeasance or dishonesty." App. 62 (Am. Compl. ¶ 17). David also vowed at the same time, Virginia charges, that Virginia "would never receive another penny from the Estate"—by which he meant that he did not intend for the Estate ever to pay out her distributional share. *Id.* at 63 (Am. Compl. ¶ 18). Because of the Will's provision with regard to the consequences of the death of a sibling, all understood that David would benefit financially if Virginia (but not David) died before the Estate closed. He told her, she says, on several occasions, "I'm 15 years younger than you, I'll outlive you, and I can keep the Estate open until after you die." *Id.* (emphasis omitted).

In keeping with that threat, Virginia alleges, the Estate remains open. No distributions had been made as of 2016, when she filed suit (or, indeed, has been made to date). The Connecticut Probate Court has effected no meaningful oversight of David's activities, she charges. Rather, David and the Estate have successfully side-stepped enforcement of court orders requiring production of discovery related to the Estate's financial management. David has filed interim accountings of the Estate's assets with the Probate Court only infrequently, and, in any event, the accountings that he has

7

filed have been both vague and inaccurate because they omitted "numerous" property transactions. *Id.* at 65 (Am. Compl. ¶ 24). Virginia also alleges that from 1986 until 2010 David made "substantial (but undisclosed)" contributions to the reelection campaigns of the Connecticut Probate Court judge who presided over the Estate. *Id.* at 93 (Am. Compl. ¶ 99). When these contributions came to light in 2010, she asserts, the probate judge recused himself from further supervision of the Estate. *Id.*

## II. David's schemes for enrichment

The Complaint alleges that David "plunder[ed], pillage[d,] and loot[ed] the assets of the Estate to the extent that the Estate is now insolvent . . . ." App. 66 (Am. Compl. ¶ 27). David "ran the Estate as his personal piggy bank," conducting its affairs for his own financial benefit, both to the detriment of his sister Virginia and his mother's estate and in violation of his fiduciary duties and RICO. *Id.* at 64 (Am. Compl. ¶ 21). In the Complaint, Virginia identifies and details several specific "schemes" through which David allegedly siphoned value from the Estate to himself. Virginia alleges that defendant Nicholas Vitti, David's "personal financial advisor and confidant for matters pertaining to the Estate," assisted and advised David in all matters related to the Estate, including many of the identified schemes. App. 60 (Am. Compl. ¶ 8.6). The remaining defendants (Mary Lou, David's friend Gregory Garvey, and the entities Red Knot Acquisitions, LLC and Silver Knot, LLC) were involved in only certain of the questionable transactions, as set forth below.[4] We describe these ventures in

---

[4] Although Larry remains an Executor and was involved in (and would have benefited from) many of the schemes the Complaint describes, Virginia does not allege that he committed fraud or "willful misconduct," and does not name him as a defendant. App'x 100 (Am. Compl. ¶ 115).

8

approximately the order of their inception, including here much of the narrative provided in the Complaint, as its detail bears on the sufficiency of the Complaint in fending off Defendants' Rule 12(b)(6) challenges.

A.    The Honeyspot Road scheme

In 1986, the Estate owned a 16-acre undeveloped plot of real estate on Honeyspot Road in Stratford, Connecticut. The property was leased by Pace Motor Lines, Inc., a trucking company owned by the Pacelli brothers, friends of the D'Addario family. Shortly after Francis's death, the property was appraised and valued at $3.8 million. In January 1989, the Estate accepted an offer to purchase the land for $3.2 million. This sale, however, never closed.

Instead, "[s]ometime after 1990," David stopped having the Estate pay real estate taxes on the property. App. 67 (Am. Compl. ¶ 32). In 1996, after the Estate had accrued a real estate tax deliquency of more than $149,000, the Town scheduled the property for a tax foreclosure sale. Rather than pay the overdue taxes—although the Estate was legally and financially able to do so—David allowed the foreclosure sale to occur. At that sale, in June 1996, the property was purchased by Dennis and William Miko, friends of Mary Lou, for just over $179,000.

Although the Estate could have redeemed the property by paying its tax bill and a penalty within one year of the sale, David elected not to do so. Instead, he set up a limited liability company, Honeyspot Ventures, LLC ("HSV"), co-owned by himself, Mary Lou, and Larry, and, in September 1997, HSV purchased the property from the Miko brothers for $250,000. Approximately one year after purchasing the parcel, HSV sold it for $1.1 million to an entity owned by the Pacelli brothers. David, Larry, and

9

Mary Lou divided the $850,000 profit evenly, and David proceeded to partner with the Pacellis in a separate "very profitable" business venture. App. 69 (Am. Compl. ¶¶ 35-36).

### B. The Red Knot forbearance scheme

When the Estate opened in March 1986, it reported liabilities totaling $41,363,977 and assets totaling $162,636,000. Of the Estate's roughly $41 million in debt, more than half ($25,218,084) was owed to three banks: Connecticut National Bank, Connecticut Bank and Trust Company, and People's Bank (collectively, the "Bank Group"). In December 1990, the Bank Group, acting as one, loaned an additional $14 million to the Estate. As a condition of the 1990 loan, the Executors agreed to abide by a "stringent budget and strict reporting requirements," with the goal of selling assets to pay off the Estate's creditors, including the Bank Group, and timely closing the Estate. App. 73 (Am. Compl. ¶ 49).

The Executors breached these requirements and came nowhere near the stated goal. Accordingly, in July 1992, the Bank Group turned to the Probate Court for relief, filing a "Joint Application for Removal of Executors," and expressing "extreme[] concern[]" about the "negligent and improper manner in which the Executors have administered this Estate." App. 73-74 (Am. Compl. ¶¶ 50-51). They alleged that both David and Larry had "serious conflicts of interest" in light of their concurrent status as Executors and beneficiaries of the Estate. *Id*. For five years thereafter, the probate judge who oversaw the Estate at that time issued no ruling on the removal motion.

By the end of December 1997, the Estate owed the Bank Group more than $48 million on the loan, in principal, accrued interest, and penalties. Citing their own

10

"substantial financial difficulties," the Bank Group offered to extinguish the entirety of the Estate's loan obligations to them, and release the liens it held on Estate assets, in exchange for a one-time cash payment of $4,750,000. App. 75 (Am. Compl. ¶ 53). David declined the offer. Instead, at David's instance, his friend, defendant Gregory Garvey, created an entity called Red Knot Acquisitions, LLC ("Red Knot"), as a vehicle for purchasing the entirety of the Estate's debt to the Bank Group. It did so, paying the $4,750,000 amount proposed by the lenders.[5]

Red Knot and the Estate then also entered into a so-called Forbearance Agreement, prepared by David's attorney (who is not a defendant here). The Forbearance Agreement gave Red Knot a lien on "virtually all" assets of the Estate, and provided that, if David was ever removed as an Executor of the Estate, Red Knot would have the "immediate right" to foreclose on those assets and collect on the Estate's accumulated debts. App. 77 (Am. Compl. ¶ 59). This agreement has made it practically impossible to remove David as an Executor.

Unsurprisingly, although it succeeded to the Bank Group's rights in other respects, Red Knot did not pursue the Bank Group's pending motion to remove David and Larry as Executors. Red Knot also later opposed a Motion to Remove the Executors filed by another Estate creditor, The Cadle Company, citing Red Knot's position as "the Estate's largest secured creditor." In 2002, Vitti represented to the Connecticut Superior Court in related proceedings that, if David was removed as Executor, Red Knot would

---

[5] Virginia alleges that the Red Knot entity is David's "alter-ego," although it is ostensibly owned by Garvey. App. 75 (Am. Compl. ¶ 54).

11

promptly foreclose on the Estate's assets, and thereby "destroy" the Estate. App. 82 (Am. Compl. ¶ 70).

With his position as an Executor secured, David flagrantly mismanaged the Estate, failing to pay its debts (which would have allowed him to close the Estate) and, instead, continuing to loot its assets and usurp its business opportunities. Egregiously, David failed to take advantage of a contractual provision in the Forbearance Agreement (the "Estate Purchase Option") that would have allowed the Estate to repurchase the Bank Group's loan position from Red Knot at a "steep discount," eliminating the largest portion of the Estate's overall debt, as long as the purchase was made by January 7, 2003. App. 78 (Am. Compl. ¶ 60). On August 31, 2000, for example, the Estate could have bought out Red Knot's position under the Estate Purchase Option for a mere $828,383, an amount that the Estate then had available in cash. Instead, David let the option lapse, and Red Knot's hold on the Estate grew in tandem with the size of the debt. By February 27, 2012, the Estate owed Red Knot (standing, in essence, in the Bank Group's stead) more than $100 million.

C. Wrongful transfers of residential properties

The Estate held title to several residential properties. These included furnished condominiums in New York City; San Francisco; Fort Lauderdale, Florida; and Quechee Lake, Vermont (along with a two-acre lot in that state). For approximately the first decade of the Estate's pendency—that is, until the late 1990s—siblings David, Mary Lou, and Larry had "free and unfettered use" of these properties, while the Estate paid related expenses. App. 83-84 (Am. Compl. ¶ 73). In 1997, the New York City and Vermont condominiums were deeded to David, and the Vermont lot was deeded to

12

Mary Lou. Neither David nor Mary Lou paid the Estate for these properties. In 1999, the San Francisco condominium was sold to an unrelated third party, and the proceeds of that sale were deposited—not into the Estate—but into a trust established in Larry's name.

### D. The Frenchtown Road scheme

The Estate owned a 50% interest in a 34.4-acre parcel of undeveloped land in Trumbull, Connecticut, on Frenchtown Road. In a financial statement completed shortly before Francis's death, that interest was valued at $1.25 million. In the spring of 1998, David discovered that the Town of Trumbull was interested in purchasing the property to use as a location for a new elementary school. He proceeded to form a limited liability company, Sunny Spot Associates, LLC ("SSA"), and at summer's end that year, acting through SSA, David purchased the remaining 50% interest in the property from the then-owners, paying $450,000. In October 1999, the Town of Trumbull then purchased the entire parcel from SSA and the Estate for $6 million. Completing the transaction, it seems, the Estate then contributed $750,000 to the Town of Trumbull in exchange for the right to have the school that would be built on the land named after Ann D'Addario, the siblings' mother.

Virginia contends that, in this transaction, David breached his fiduciary duty by usurping a business opportunity that rightfully belonged to the Estate. If the Estate had purchased the remaining 50% interest in the Frenchtown Road property in August 1998 on the same terms as SSA obtained, it would have earned a $2.55 million profit. Instead, David pocketed that profit himself.

13

### E. The Silver Knot scheme

In early 1999, David and his friend Gregory Garvey created Silver Knot, LLC, ostensibly to acquire a controlling interest in a particular producer of aluminum can stock. Over several years, Silver Knot did just that. In 2014, fifteen years later, an international aluminum company, Constellium N.V., purchased Silver Knot for $1.4 billion, $455 million of which was in cash. Virginia asserts that David funded the venture with moneys misappropriated from the Estate, and accordingly, she argues, the Estate is entitled to an equitable interest in the proceeds of the sale.

### F. The Cadle suit settlement scheme

On May 31, 2012, The Cadle Company ("Cadle")—a creditor of the Estate that tried unsuccessfully for decades to obtain payment on the $1 million promissory note it held—filed suit in the District of Connecticut against David, Garvey, Red Knot, and others, alleging a civil RICO conspiracy similar to that asserted here by Virginia. (Cadle had earlier pursued legal action against the Estate in state court, including, in 1997, by filing an unsuccessful motion to remove Larry and David as Executors of the Estate.)

The district court (Young, *J.*) "administratively closed" Cadle's suit in June 2013 for a period of nine months, expressing a desire to allow David the opportunity to close the Estate, App. 132, and ruling at the same time that either party would be free to move to reopen the case at the end of the nine-month period. When that time arrived, Cadle sought to reopen the case. *See The Cadle Co. v. D'Addario*, No. 3:12-cv-00816-WGY, Dkt. No. 154, (D. Conn. Mar. 17, 2014). That motion was granted, *id.* at Dkt. No. 155 (D. Conn. Apr. 2, 2014), but, citing concerns about the ripeness of Cadle's claim in light of the pendency of the Estate, the district court once again administratively closed the case

14

without ruling on the defendants' pending motions to dismiss, *see The Cadle Co. v. D'Addario*, No. 12-00816-WGY, 2014 WL 12760747, at *4 (D. Conn. July 22, 2014).

Following these fruitless legal efforts, Cadle entered into a settlement agreement with Red Knot and Garvey in February 2015. In exchange for the assignment of its rights against the Estate to Red Knot and dismissal with prejudice of its RICO claims against David and others, Cadle accepted a payment of approximately $5.1 million, a sum significantly larger than the approximately $3.17 million it was then owed by the Estate. Red Knot, however, did not directly fund the settlement. Instead, the Estate transferred one of its assets (the Hi Ho Motel, in Fairfield, Connecticut) to Red Knot in exchange for a $4.5 million "credit" on the Estate's loan obligations. Red Knot then sold the motel to third parties for $3.7 million and used that money toward the Cadle settlement. David personally contributed the additional $1.5 million in settlement funds.

### III.    Procedural history

In January 2016, after fruitless efforts in the Connecticut state courts, Virginia filed this suit in the United States District Court for the District of Connecticut (Arterton, *J.*) against her brother, David; her sister, Mary Lou; Gregory Garvey; Nicholas Vitti; Red Knot; and Silver Knot (together, "Defendants"). Her primary claim against Defendants rested on provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* Asserting a right to treble damages

15

under section 1964(c), she alleged violations of RICO sections 1962(b), (c), and (d).[6] Virginia also alleged several Connecticut law claims related to David's alleged breach of his fiduciary duty to the Estate. In May 2016, Virginia filed an Amended Complaint— the 144-paragraph pleading at issue here. In it, she again alleged a RICO-based claim; she also asserted new state law claims.

From the start, Virginia has sought RICO treble damages based on two types of injuries: first, loss of the inheritance she contends that she (and her mother's estate) would have received from the Estate had David not rendered it insolvent (the parties refer to these as "lost debt" damages); and, second, the more than $200,000 in legal expenses that she incurred in the four years before filing this suit, in her efforts to oppose David's mismanagement of the Estate and unseat him as Executor (the parties refer to these as "collection expenses") through various actions pursued in the courts of Connecticut. (David appears to have blocked Virginia's attempted legal interference on at least one earlier occasion by invoking the promise she made in exchange for the 1987 loan. *See D'Addario v. D'Addario*, No. 27 86 23, 1991 WL 59744, at *4 (Conn. Super. Ct. Mar. 14, 1991).)

---

[6] *Section 1962(b)* of title 18 prohibits "any person through a pattern of racketeering activity . . . [from] acquir[ing] or maintain[ing], directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

*Section 1962(c)* prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, [from] conduct[ing] or participat[ing], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

*Section 1962(d)* prohibits conspiracy to violate the other subsections of section 1962.

The District Court granted Defendants' motion to dismiss the Amended Complaint. *D'Addario v. D'Addario*, No. 3:16cv99 (JBA), 2017 WL 1086772 (D. Conn. Mar. 22, 2017) (Arterton, *J.*). In a detailed ruling, it determined that Virginia's claim for "lost debt" damages was not ripe for adjudication under applicable RICO case law because it remained uncertain whether Virginia would receive any distribution from the Estate to offset her claimed damages. This uncertainty made the amount she would ultimately be owed too speculative for recovery and trebling under RICO. The court ruled, in contrast, that her claim for collection expenses already incurred was ripe.

As to those expenses, however, the District Court concluded that the Complaint's allegations were insufficient to state a civil RICO claim. It explained that Virginia had failed to identify a distinct "acquisition and maintenance" injury, as required to make out a claim based on a violation of section 1962(b). And it explained further that Virginia had failed sufficiently to identify an "enterprise" to support a theory for recovery under section 1962(c). Because the Complaint laid an inadequate basis for finding a violation of either of these subsections, the District Court also rejected Virginia's claim under section 1962(d) for RICO conspiracy. Having dismissed the only federal claim presented in the Complaint, the District Court declined to exercise supplemental jurisdiction over Virginia's state law claims.

This appeal followed.

## DISCUSSION

Virginia contends that several aspects of the District Court's ruling are flawed. She identifies error in the court's determination that her lost debt damages were not yet

ripe. She also argues that, contrary to the District Court's conclusion, the facts set forth in the Complaint are sufficient to establish that she suffered an "acquisition or maintenance injury" as required by section 1962(b), and that Defendants were associated with an "enterprise" as required to pursue recovery under section 1962(c). Defendants, for their part, defend the District Court's ruling on ripeness as to the lost debt injury, and, predictably, if cursorily, attack it as to collection expense damages. They further adopt the District Court's analysis of the Complaint's insufficiency with respect to claims based on sections 1962(b) and (c), and they maintain in addition, in a ground rejected by the District Court, that Virginia's asserted injuries were not proximately caused by their actions, making dismissal correct in their view for several independent reasons.

We review the District Court's ruling de novo, construing the facts alleged in the Complaint in the light most favorable to Virginia, and drawing all reasonable inferences in her favor. *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 118 (2d Cir. 2013). On such review, we conclude that the District Court correctly determined that Virginia's claim for her share of the Estate's assets is unripe and that her claim for collection expenses is ripe. We also determine that Virginia has sufficiently alleged that her collection expense injuries were proximately caused by the claimed RICO violations. In contrast to the District Court, we rule that Virginia has sufficiently identified a distinct acquisition and maintenance injury under section 1962(b) to support her collection expenses claim with regard to David, Gregory Garvey, and Red Knot, but not with regard to the other defendants. We further conclude that Virginia has also sufficiently alleged a section 1962(c) "enterprise" with regard to all six defendants, supporting her claim for

18

collection expenses on this theory of recovery as well. For these reasons, we vacate the District Court's dismissal as to Virginia's RICO claim on her own behalf and on behalf of her mother's estate for collection expenses and remand that claim and her state law claims for further proceedings consistent with this opinion.

**I.      Ripeness of private actions brought under RICO**

Our Circuit's statutory ripeness jurisprudence in the RICO context grows from the Supreme Court's decision in *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321 (1971), in which the Court ruled—in the context of a private action for treble damages recovery under the Sherman Act—that a cause of action has not accrued when "the fact of [future damages] is speculative or their amount and nature unprovable." *Id.* at 339; *see also* David B. Smith & Terrance G. Reed, *Civil RICO*, ¶ 6.04[5][a] (Matthew Bender 2017). We have concluded that no civil RICO cause of action treble damages accrues "until the amount of damages becomes clear and definite." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994); *see also id.* at 767 (noting that "injury to business or property" is one of three "conditions a plaintiff must meet to satisfy RICO's [statutory] standing requirements").

A.      <u>Distribution of Estate assets: claim for "lost debt" injuries</u>

We agree with the District Court that Virginia's RICO claim for her rightful share of the Estate is not yet ripe. Our Circuit has consistently ruled in the RICO context that claims for "lost debt" injuries—that is, for damages in the form of an owed, but as-yet-uncollected, amount—are unripe when parallel proceedings to collect the amount owed are ongoing in another forum. We have reasoned that, since "RICO [treble] damages are netted against recovery obtained from collateral and other sources," the outcome of the

19

parallel proceedings could significantly affect the total amount owed in the case at bar, and that this fundamental uncertainty renders the claim not ready for adjudication. *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135-36 (2d Cir. 2003) (finding unripe plaintiffs' RICO claim for injury based on unpaid loans where plaintiffs had not yet foreclosed on loan security and related arbitrations were pending). Although some other courts have taken a different approach, *see, e.g.*, *Grimmett v. Brown*, 75 F.3d 506 (9th Cir. 1996), our jurisprudence on this point is long- and well-established. *See, e.g.*, *First Nationwide Bank*, 27 F.3d at 769 (finding unripe RICO claims for injury arising from plaintiffs' loans to defendant where, though information from defendants provided as a basis for the loans was alleged to be false, no default had yet occurred); *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1165-66 (2d Cir. 1993) (finding unripe a RICO claim for injury in amount of two state court judgments entered against defendant where (1) one judgment was satisfied after initiation of RICO suit, and (2) second judgment was "likely to be fully satisfied"); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105-06 (2d Cir. 1988) (RICO claim for lost debt injury unripe because fraudulently transferred assets might yet be recovered during bankruptcy proceedings).

Proceedings regarding the Estate are underway in Connecticut Probate Court, as we have described. That they have been ongoing for more than thirty years, however, and that the Forbearance Agreement is in place (*see* Background Part II.B, *supra*), unavoidably raises the question whether they will ever end, and whether their pendency can reasonably be treated as we have treated parallel proceedings in the cases just cited: that is, as grounds to preclude the related RICO suit.

20

Nonetheless, the problem identified by the District Court and recognized in our case law remains: the amount of Virginia's ultimate distribution from the Estate—and, thus, the amount of her damages, as measured by the difference between any distribution she actually receives and the distribution she should have received—is remarkably uncertain. The value of the Estate is not static: David and Larry are still authorized, as co-executors, to conduct the Estate's business, to buy and sell its real estate and businesses, and thereby to control the Estate's net value. In fact, many of the "schemes" identified in the Complaint are examples of David's misappropriating for himself lucrative business opportunities that should have been treated as belonging to the Estate and the legatees. We have held in the civil RICO setting that defendants are "not liable for all losses that *may occur*, but only for those *actually suffered*." *Motorola Credit Corp.*, 322 F.3d at 136 (quoting *First Nationwide Bank*, 27 F.3d at 768) (emphasis in *Motorola*). Applying this standard, we cannot escape the conclusion that Virginia's lost debt claim is not ripe because she cannot even estimate with reasonable certainty the amount of her anticipated distributional share.

Virginia argues that there is no "realistic" possibility that the amount of her damages will fluctuate in light of circumstances described in the Complaint, Appellant's Br. 67, because these have rendered the Estate "hopelessly insolvent," App. 66 (Am. Compl. ¶ 27). In her view, the likelihood that she will receive *any* distributional share when the Estate closes is nil, no matter what interim fluctuations in value the Estate's assets might experience.

The argument has some force, but we are skeptical that the law requires us to accept at face value the claim that the Estate's alleged insolvency is "hopeless[]," given

the variability of the Estate's assets and liabilities and the unpredictability of the market forces at play. For example, Virginia has pleaded that the Estate's liabilities outstrip its assets, but she also alleges that David himself—through Red Knot—holds $100 million of the Estate's debt. That liability, accordingly, seems amenable to decrease or even elimination. Moreover, Virginia asserts that the Estate has an equitable interest in Silver Knot, because the latter was funded with moneys stolen from the Estate. A balance sheet that takes into account the Estate's entitlement to some portion of the $455 million cash payment that Silver Knot received in 2014 might reflect a more accurate assessment of the Estate's solvency.

Virginia's assessment of the Estate's condition also does not recognize that the Connecticut Probate Court is empowered to alter the Estate's balance of assets and liabilities in at least two potentially effective ways. First, the Probate Court may assess a significant surcharge against David for any fiduciary breaches that the court identifies. *Gaynor v. Payne*, 261 Conn. 585, 596-97 (2002). Virginia's allegations suggest that David would have access to assets sufficient to satisfy such a surcharge. Second, that court is authorized in certain circumstances to declare prior asset transfers null and void, and to impose a constructive trust on assets wrongfully transferred from an estate. *See In the Matter of Edwin A. Jarmoc*, 29 Quinnipiac Prob. L. J. 443, 451-52 (2016).[7] These powers raise the possibility that some of the asset transfers identified by Virginia as "plundering" could be revoked and the assets returned to the Estate, increasing its net value and Virginia's proportionate share upon distribution. Accordingly, even those

[7] Virginia suggests that a constructive trust claim would be time-barred, but points to no legal authority suggesting that such a bar would bind the Probate Court's hands.

22

particular schemes for which a loss amount is theoretically calculable—such as the Honeyspot Road scheme—do not yet give rise to clear and definite damages. Such acts of rectification by the Connecticut Probate Court would doubtless not be easy to accomplish, but because "[t]hese contingencies, and other conceivable contingencies, remain," our precedent teaches that Virginia's RICO claim for triple the value of her distributional share of the Estate is not ripe for adjudication. *Motorola Credit Corp.*, 322 F.3d at 136.

Virginia has also alleged that final assessments of the Estate's value and distributions to legatees will simply never come to pass. She asserts that David intends, and is likely able, to keep the Estate open until her death (at 70, she is David's elder by 15 years), and that the bona fides of his threat are evidenced by David's undeniable success in keeping the Estate open for more than thirty years so far. Abiding by our RICO ripeness jurisprudence under these circumstances will, in effect, improperly enable David to carry out his unlawful plan, she insists: that is, he will keep the Estate unresolved until Virginia's death, at which point her share will devolve to the Estate and be divided equally among her surviving siblings.

We are not enabled by these pleas to depart from our precedent. Unfortunate as Virginia's situation might be, the RICO statute as construed in our Circuit simply does not provide a remedy before a plaintiff has suffered reasonably ascertainable damages. Nor may a RICO plaintiff, through predictions of a defendant's future plans, artificially ripen a claim that is unripe under our jurisprudence. *Cf. Kurtz v. Verizon New York, Inc.*, 758 F.3d 506, 516 (2d Cir. 2014) (endorsing application of ripeness inquiry that governs Fifth Amendment takings claims to due process claims as well to "prevent[] evasion of

23

ripeness test by artful pleading"). Moreover, even accepting Virginia's allegations as true, we are not convinced that—barring something unexpected—the Estate is sure not to close until after Virginia's death. Although Virginia alleges that David has kept the Estate open without significant interference by the Connecticut Probate Court, the appointment of a new Probate Judge in 2010 and the Connecticut legislature's substantial reform of the Connecticut Probate Court system in 2011 raise the possibility that closure will now in fact occur. *See generally* Margaret E. St. John, *The Connecticut Probate Court System Reform: A Step in the Right Direction*, 24 Quinnipiac Prob. L. J. 290, 301-02 (2011). For instance, the new judge appears to have been more active in managing the Estate than was his predecessor in earlier years, as demonstrated by his 2012 order directing the Executors to file quarterly updates reporting on their steps toward finalizing the administration of the Estate.

For these reasons, we conclude that Virginia's RICO claim for "lost debt" damages based on the amount of her expected inheritance (and that of her mother's estate) is unripe.

B.    RICO claim for collection expenses

Virginia's claim for RICO damages based on the amount of collection expenses that she has incurred to pursue a legal remedy to David's alleged wrongdoing does not suffer from the same infirmity. Virginia contends that she has incurred legal expenses in excess of $200,000 in connection with her state-court legal attempts, albeit unsuccessful, to enforce her rights and halt David's despoiling of the Estate. We have long recognized that a plaintiff may recover legal fees, including expenses incurred in one or more attempts to combat a defendant's RICO violations through the legal system, as damages

in a civil RICO action. *See Bankers Trust Co.*, 859 F.2d at 1105. Virginia's claimed legal expenses fall squarely within that category of cognizable damages.

Defendants mount only a cursory challenge to that conclusion: they assert by way of a footnote that the collection expenses claim is not ripe since the full extent of the expenses that she will ultimately have incurred—including, presumably, from this litigation—is yet unknown. The law of our Circuit does not support their contention. Unlike her claims with respect to her future distributional interest, as to which collateral proceedings are pending, Virginia has already suffered a "clear" and "definite" loss in the form of her legal expenses. Although the amounts may increase over time, the past expenses will not disappear when the Estate is closed. *See First Nationwide Bank*, 27 F.3d at 768. The "collection expenses" damages Virginia claims in this litigation—that is, the $200,000 that she allegedly incurred over the four years before she filed the Complaint (as allowed by the RICO statute of limitations)—are thus neither "speculative" nor "unprovable." *Bankers Trust Co.*, 859 F.2d at 1106. The possibility that Virginia will bear additional related legal expenses has no bearing on this conclusion. Her RICO claim based on the legal expenses she has incurred is therefore ripe.

**II.    Proximate causation of Virginia's legal expenses**

Section 1964(c) of title 18 authorizes a private cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962 . . . ."  To make out a claim under this section, Virginia must prove not only (1) that Defendants violated section 1962 and (2) that she suffered an injury to her "business or property," but also (3) that her injury was caused "by reason of" the RICO violation—a standard that we have equated to the familiar "proximate cause" standard. *See Sergeants*

*Benevolent Ass'n Health and Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 86 (2d Cir. 2015).[8] Defendants contend that the Complaint sets forth allegations suggesting at best that their alleged RICO violations proximately caused injury to the *Estate*, not to Virginia as a legatee. For this reason, they urge, Virginia has no viable civil RICO claim even if some portion of her damages are ripe, as we have determined that they are.

As we have commented elsewhere, "proximate cause requires . . . some direct relation between the injury asserted and the injurious conduct alleged, and excludes . . . those links that are too remote, purely contingent, or indirect." *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 323 (2d Cir. 2011) (internal quotation marks and alterations omitted). Here, the causal relationship between Defendants' conduct and Virginia's collection expenses injury is easily identifiable: Defendants (chiefly David), through their violations of 18 U.S.C. § 1962(b) and (c), are alleged to have destroyed the value of the Estate, in which Virginia, as a beneficiary, has an identifiable interest under Connecticut law. Virginia took steps and incurred related legal expenses to halt that wrongdoing. *Gaynor*, 261 Conn. at 592 ("It is well settled that a person's right of inheritance vests at the moment of the decedent's death . . . ."). To the extent that an additional step may separate the alleged RICO violations and Virginia's claim for collection expenses incurred, we are bound by Circuit precedent recognizing such expenses to be a valid

---

[8] Although this causation requirement has sometimes been described as necessary to support "statutory standing," we think it is better understood as an element essential to the viability of a plaintiff's claim. *See Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358-59 (2d Cir. 2016) (noting that "what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute'" (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014))).

basis for RICO damages. *See, e.g., Bankers Trust Co.*, 859 F.2d at 1105; *Stochastic Decisions, Inc.*, 995 F.2d at 1166-67. These expenses were incurred in an attempt to protect both the Estate and Virginia's share of that Estate, and, for purposes of our causation inquiry here, the two are reasonably treated as indivisible.

Defendants cite primarily to the Sixth Circuit's decision in *Firestone v. Galbreath*, 976 F.2d 279 (6th Cir. 1992), in their effort to divorce these interests, but it is not to the contrary. The *Firestone* court found that beneficiaries of an estate had not suffered a "direct injury" cognizable under RICO from the defendants' alleged wrongdoing. *Id.* at 285. There, the testator's grandchildren, beneficiaries of her estate, brought various fraud and RICO claims against certain relatives and former associates of the testator, *id.* at 281-82, alleging that the defendants had "looted [the testator's] estate as she lay dying," diminishing their inheritances when she later died. *Id.* at 282. Here, in contrast, the alleged looting took place after Francis died, when the Estate already existed and Virginia's interest in the Estate had vested, aligning her interest and that of the Estate temporally and conceptually. *See Gaynor*, 261 Conn. at 592.

Accordingly, we conclude that Virginia's injuries are not so removed from Defendants' misdeeds as to place them outside the reach of the proximate causation chain as a matter of law. The expenses that she has incurred to stop the incursion are sufficiently proximate to the identified RICO violations support a claim under section 1964(c).

**III. Section 1962(b) theory of recovery**

Section 1962(b) makes it unlawful for a person, "through a pattern of racketeering activity[,] . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." Our Circuit, like many others, requires a plaintiff who brings a civil RICO claim for a 1962(b) violation to demonstrate an injury arising from the defendants' acquisition of an interest in, or maintenance of control over, an alleged enterprise. *See* Jed S. Rakoff and Howard W. Goldstein, *RICO: Civil and Criminal Law and Strategy*, § 3.03[2], 28-29 & n.23 (2011) (noting that, as of 2011, all circuits but the Fourth and Eighth require plaintiffs alleging a section 1962(b) violation to identify an "acquisition or maintenance" injury).

The "acquisition or maintenance" requirement in our Circuit stems from our decision in *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055 (2d Cir. 1996), *vacated on other grounds by NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998). In that case, plaintiff Discon, a telephone equipment removal company, alleged that the defendants had committed certain racketeering acts in connection with their control of NYTel, a local telephone service provider. *Id.*at 1057-58. We ruled that Discon failed to state a RICO claim arising out of a violation of section 1962(b), primarily because it did not allege that defendants' acquisition or control over NYTel was obtained through a pattern of racketeering activity. *Id.* at 1063. At the same time, we observed that the section 1962(b) claim was also flawed because Discon had failed to allege that its injuries were caused by the defendants' acquisition or maintenance of NYTel, rather than by the defendants'

28

various racketeering acts. *Id.* This alternative holding has taken on significance over time.

Virginia has certainly alleged in some detail that her collection expense injuries are traceable to Defendants' control over the Estate, and that Defendants' control was maintained through a pattern of racketeering activity. Although David is not alleged to have "acquire[d]" his position as an Executor through racketeering acts, the facts as stated in the Complaint provide a more than sufficient basis from which to infer that David *maintained* his position (and its attendant control of the Estate) through the Red Knot forbearance scheme.

When David and Garvey created Red Knot, the Estate's largest secured creditors had sought to remove David as an Executor. By replacing those creditors with an entity that he is alleged to control, David neutralized a threat that could have led to his removal as an Executor and fortified his position through the Forbearance Agreement, purportedly making his position impervious to attack. And, later, when Cadle sought a court order removing him as an Executor, Red Knot opposed that motion, invoking its status as the Estate's major secured creditor to give weight to its support of David. Several of the schemes—including two sets in particular (the allegedly wrongful transfers of residential property from the Estate to David, Larry, and Mary Lou, and the Cadle suit settlement scheme, all of which directly removed assets from the Estate)— occurred after the Red Knot forbearance scheme had cemented David's hold on the Estate. The expense collection losses attributable to those alleged breaches can reasonably be attributed to David's "maintenance" of control over the Estate.

Relying on *Discon*, however, the District Court concluded that the expense injuries attributable to Defendants' alleged acquisition or maintenance of control over the Estate were insufficiently "separate and distinct" from the injuries that resulted from the predicate acts alleged in the Complaint. *D'Addario*, 2017 WL 1086772, at \*18. We disagree. To successfully plead a RICO claim, a plaintiff must indeed allege distinct damages arising from the acquisition or maintenance of control of the enterprise. In other words, those damages must be different from the damages that flow from the predicate acts themselves. For example, a racketeer might use a pattern of physical threats and violence, including an act of arson against the plaintiff's property, to extort an interest in the plaintiff's business. The cost of replacing or repairing property damaged in the fire is a loss caused by the predicate act, the arson, not by the ultimate acquisition of an interest in the plaintiff's business. The "separate and distinct" damages caused by the RICO violation, as opposed to by the predicate acts, is the value of the share of the plaintiff's business that the owner turned over to the defendant.

Similarly, in this case, Virginia alleges losses specifically attributable to the predicate acts of fraud, such as the loss of the estate assets that were turned over to Red Knot. But that scheme also maintained David's control of the Estate, by making his position as Executor impregnable. At a minimum, that entrenchment of control contributed to Virginia's collection damages, because David's enhanced position meaningfully complicated her efforts to unseat him. We conclude, therefore, that Virginia sufficiently pleaded a separate and distinct "acquisition or maintenance" injury.

30

The question remains, however, whether Virginia has adequately pleaded such an injury as to *each* of the six defendants: David, Mary Lou, Garvey, Vitti, Red Knot, and Silver Knot. Of these defendants, only David as an Executor had a formal position through which he exerted control over the Estate. (Recall that Virginia did not name Larry, her brother and now the other Executor, as a defendant in this suit.) We accept Virginia's argument that the Complaint plausibly asserts that, along with David, Red Knot and Garvey also exerted significant control over the Estate, helping to perpetuate David's control and each contributing thereby to the requisite "acquisition or maintenance" injury. For example, the Complaint alleges that by purchasing the Estate's loans from the Bank Group, Red Knot gained not only a standard secured creditor's interest in the Estate's assets, but also the contractual right under the Forbearance Agreement to initiate potentially disastrous wholesale foreclosure proceedings upon David's removal. Red Knot's power to foreclose on "virtually all" of the Estate's assets in the event of a management change plausibly represents a meaningful form of "control" over the Estate. App. 77 (Am. Compl. ¶ 59). And it would be imprudent to conclude, at this early stage in the proceedings, that Gregory Garvey—as Red Knot's nominal owner—lacked any power or control over Red Knot, or, through Red Knot, the Estate. Accordingly, Virginia has pleaded a viable claim under section 1962(b) against Red Knot and Garvey, as well as against David.

The remaining defendants, however, are not themselves alleged to have exerted any direct control over the Estate's management, much less control that was acquired or maintained through any alleged racketeering acts. Virginia alleges generally that Mary Lou, Silver Knot, and Vitti took part in (or, in Vitti's case, advised David regarding) one

31

or more of the various schemes by which David looted the Estate. Without more, however, participation as a third party in a business transaction with the Estate does not constitute either maintenance of an "interest in" or exercise of "control over" the Estate for purposes of section 1962(b). Accordingly, Virginia failed sufficiently to allege that Mary Lou, Silver Knot, or Vitti violated section 1962(b).

**IV.    Section 1962(c) theory of recovery**

Section 1962(c) of title 18 makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." The existence of an "enterprise"—one existing "separate and apart from the pattern of activity in which it engages"— is a necessary element of a section 1962(c) violation. *United States v. Turkette*, 452 U.S. 576, 583 (1981).

All six Defendants claim that, even accepting the Complaint's allegations, they were not associated with an "enterprise" within the meaning of the statute and, thus, that Virginia has not adequately pleaded that they violated section 1962(c). Virginia identifies two possible "enterprises" with which all Defendants purportedly associated: (1) an "association-in-fact" consisting of all six Defendants, and (2) the Estate itself.[9]

---

[9] We do not opine here on the question whether Virginia could plausibly allege a series of more limited associations-in-fact, consisting of the participants in particular schemes pursuing more limited purposes than David D'Addario's wholesale looting of the Estate. Although our recitation of the narrative above might be read to suggest any number of such associations, we decline to construct associations-in-fact that Virginia has not identified. We agree with the Third

32

A.     Association-in-fact of the six Defendants

The RICO statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).[10] The Supreme Court has observed in this regard that "[t]he term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (internal citations omitted). It has further instructed that, in accordance with the law's purposes, the RICO statute is to be "liberally construed," giving a broad and flexible reach to the term "association-in-fact." *Id.*

In line with this general approach, the Supreme Court has rejected attempts to graft onto the statute formal strictures that would tend to exclude amorphous or disorganized groups of individuals from being treated as RICO "enterprises." Accordingly, it has explained, RICO associations-in-fact need exhibit only three structural features: (1) a shared purpose; (2) relationships among the associates; and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

Defendants do not meaningfully contest that the Complaint adequately alleges longevity, inasmuch as Defendants' charged association in connection with the Estate

---

Circuit that, where a plaintiff has "conspicuously refrained, throughout the district[ ]court proceedings and on appeal, from asserting alternative [multi-entity,] bilateral[,] or single-entity enterprises," we should not endeavor to replace the enterprise identified by the plaintiff with an alternative, differently constituted enterprise with a different purpose. *See In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 375 (3d Cir. 2010).

[10] This definition applies to the term "enterprise" as used in both sections 1962(b) and (c).

has persisted for decades (and indeed, several of the individual schemes were carried out over a period of years). They argue, however, that Virginia has failed to allege sufficiently the existence of relationships among the Defendants or a common purpose. Rather, for example, they highlight David's alleged purpose—to enrich himself—and contrast it with each defendant's self-regarding, and separate, individual purpose in individual transactions: for example, Mary Lou's desire to obtain a particular residential property and Garvey's profit-oriented investment in the aluminum can company through Silver Knot. Although not in the end dispositive, *see infra* Discussion Part IV.B, we find Defendants' argument on this point persuasive.

The concept of an association-in-fact is protean, and, as such, variability is invited by the statutory language and the Supreme Court's construction of that language. District Courts and Courts of Appeals have taken various paths towards providing some predictable shape for the notion, often drawing on established conspiracy law for analogy and contrast. A number of courts—although not our court— have found that a group of individuals related by a structure that mimics so-called "rimless hub-and-spoke" conspiracies cannot be considered a RICO association-in-fact. *See, e.g., In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 374-75 (3d Cir. 2010); *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 302-03 (E.D.N.Y. 2017); *Cedar Swamp Holdings, Inc. v. Zaman*, 487 F. Supp. 2d 444, 451-52 (S.D.N.Y. 2007). In other words, when each defendant is alleged to have a relationship with a central figure, but the defendants are not all alleged to be connected in some overarching way (such as by "an agreement to further a single design or purpose"), these courts have found no RICO association-in-fact. *See* Gregory P. Joseph, *Civil RICO: A Definitive Guide* 105-07 (3d ed.

34

2010). Without such a limitation, as commentators have observed, one malefactor's series of independent frauds could be cast as a RICO conspiracy, sweeping numerous other individuals into a net of heightened liability under RICO, and doing so even if each fraud was perpetrated quite independently of the others. Such a sweep would seem to run afoul of the principle adopted by the Supreme Court in *Boyle* that individuals who act "independently and without coordination" may not be treated as part of a RICO association-in-fact. *Boyle*, 556 U.S. at 947 n.4.

We agree further with Defendants that, if proven, the facts alleged in the Complaint would establish that David engaged in a series of separate frauds involving different sets of individuals. This, they say, is insufficient to make out relationships among "the defendants as a whole" that would satisfy even *Boyle*'s relaxed test for an association-in-fact. *D'Addario*, 2017 WL 1086772, at *19. That each defendant agreed to join forces with David to defraud the Estate in a particular way does not support an inference that they all agreed to join forces with each other to pursue a goal of defrauding the Estate over decades in a variety of ways. Rather, at most, it suggests that Defendants (and in a few cases, perhaps, a small subgroup of Defendants) each agreed with David to engage in individual schemes.

Proof that "several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates, . . . [is] not . . . enough to show that the individuals were members of an enterprise." *Boyle*, 556 U.S. at 947 n.4; *see also In re Insurance Brokerage*, 618 F.3d at 374 (rejecting allegations that defendants took similar actions because they "do not plausibly imply concerted action—as opposed to merely parallel conduct"); *Rao v. BP Products N. Am., Inc.*, 589 F.3d 389, 400 (7th Cir. 2009)

35

(finding complaint did not make out an "enterprise" where it alleged "different [groups of] actors for each event" and "d[id] not indicate how the different actors are associated" or "act[ed] together for a common purpose"); *cf. Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011) (explaining that RICO enterprise is not adequately alleged where "the only common factor that linked the individually named defendants and defined them as a distinct group was their direct or indirect participation in the engineered investment scheme to defraud the plaintiff" (internal quotation marks and alteration omitted)).

Nor does the allegation that the various Defendants and subgroups agreed at different times to engage in various fraudulent schemes plausibly support the inference, essential to a RICO association-in-fact enterprise, that they acted with a sufficiently common purpose. The Complaint does not allege, for example, that Mary Lou was even aware of the Red Knot forbearance scheme, or that Garvey knew of David's residential property transfers from the Estate to himself, Mary Lou, and Larry. And the schemes themselves are not sufficiently similar in method or aim to suggest that Defendants were acting in coordination: in some (the Honeyspot Road scheme and transfers of residential property, for example), participants funneled assets directly out of the Estate into their own pockets; in others (the Red Knot and Cadle suit settlement schemes, for example), the participants protected David's position as Executor, but did not directly profit—at least, insofar as the Complaint alleges; and in still others (the Frenchtown Road and Silver Knot schemes), David allegedly usurped business opportunities that, under fiduciary principles, rightfully belonged to the Estate.

For these reasons, we conclude that the Complaint's allegations do not plausibly make out the association-in-fact enterprise proposed by Virginia, in which the six Defendants together were "devoted to . . . allowing David. . . to acquire an interest in, and then maintain control over, the affairs of the Estate," App. 200 (Amended RICO Case Statement), under her section 1962(c) theory of recovery.

## B. The Estate as association-in-fact RICO enterprise

As adverted to above in our discussion of Virginia's proposed enterprise among the six defendants, however, another potential section 1962(c) enterprise emerges from the facts alleged: that is, the Estate itself.[11] As explained above, section 1961(4) provides that any "legal entity" may qualify as a RICO enterprise, whether it is an 'individual,

---

[11] Defendants contend that Virginia forfeited the argument that the Estate is the actionable enterprise under section 1962(c) by failing to raise it in the District Court. In fact, Virginia's attorney raised this argument in the District Court at oral argument regarding Defendants' Motion to Dismiss the Amended Complaint. *See* App. 264 ("[T]here is enough evidence . . . alleged in the Complaint for us to prove the existence of an association [in] fact enterprise. But . . . also the probate estate, under *Gunther v*[.] *Dinger* [547 F. Supp. 25 (S.D.N.Y. 1982)], the probate estate in and of itself . . . is a sufficient enterprise. So there's two enterprises here."). That mention was the first, however, and Virginia acknowledges that the issue was not briefed in that court and the District Court did not have an opportunity to rule on the theory. Although on appeal we rarely consider arguments so undeveloped at the district court level, they are not irretrievably forfeited, and, in view of the complexity of this matter and the purely legal nature of this argument, we elect to exercise our discretion on appeal to address this contention. *See United States v. Gomez*, 877 F.3d 76, 95 (2d Cir. 2017) ("[W]e have discretion to consider arguments waived or forfeited below because our waiver and forfeiture doctrine is entirely prudential." (internal quotation marks and alterations omitted)). As explained above, Virginia's claim will be remanded to the extent that it involves a violation of section 1962(b). In our court, her counsel has represented that, on remand, she will seek leave to amend her complaint further to identify the Estate as the actionable "enterprise" under section 1962(c). With efficiency goals in mind, we therefore address this argument now.

37

partnership, corporation, association," and also that, in the alternative, "any union or group of individuals associated in fact although not a legal entity" may qualify as well.

Connecticut law holds that an estate is "not a legal entity. It . . . is merely a name to indicate the sum total of the assets and liabilities of the decedent or incompetent." *Freese v. Dep't of Social Servs.*, 169 A.3d 237, 251 (Conn. App. Ct. 2017) (quoting *Isaac v. Mount Sinai Hosp.*, 490 A.2d 1024, 1026 (Conn. App. Ct. 1985)). Unlike the somewhat eclectic group of defendants Virginia attempts to join together with David as an association-in-fact, however, the individuals who were formally associated with the (inchoate) Estate—that is, David and Larry, the Executors—indisputably comprise an "association-in-fact." They have a shared purpose, in fact one prescribed by law: settling the Estate by paying off its debts and distributing its assets among the heirs. As co-Executors, they have a legal relationship with each another and a shared responsibility of fulfilling that purpose. And, as the Estate is now in its fourth decade of existence, this association of the Executors has the requisite longevity: it has certainly existed long enough to allow its members to pursue their purpose.[12] We therefore

---

[12] We recognize that the import of this analysis is that probate estates, even those that are not recognized as legal entities under applicable law, may comprise associations-in-fact for RICO purposes. We have suggested as much with regard to bankruptcy estates. *See, e.g., First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 175 (2d Cir. 2004) ("[U]nder certain circumstances, a bankruptcy estate may qualify as a RICO enterprise."). This result should not be surprising. A probate estate, "although not a legal entity," 18 U.S.C. § 1961(4), would appear to be exactly the kind of "enterprise" that Congress intended to protect from infiltration or exploitation by criminal elements. *See* Gerard E. Lynch, *Rico: The Crime of Being A Criminal, Parts I & II*, 87 Colum. L. Rev. 661, 669-89 (1987) (recounting legislative history).

conclude that the Estate—an association-in-fact of David and Larry—comprises an "enterprise" under section 1961(4).[13]

A person violates section 1962(c), and may thus be liable in an action brought under section 1964, only if he "conduct[ed]" the enterprise's affairs or participated in that conduct. 18 U.S.C. § 1962(c). In *Reves v. Ernst & Young*, the Supreme Court interpreted the operative language to require a RICO defendant charged with violating section 1962(c) to have had "some part in *directing* [the enterprise's] affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (emphasis added). A RICO defendant will not be liable for mere participation in a racketeering act, but will sustain liability under the statute for participation in the "operation or management of an enterprise through a pattern of racketeering activity." *Id.* at 184; *see also First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004).

Virginia's allegations as to David easily satisfy the *Reves* "operation or management" test. Taking the facts alleged in the Complaint as true, David went far beyond merely *participating* in the management of the Estate: he was a "dictatorial" Executor of the Estate. App. 62 (Am. Compl. ¶ 15). Whether Defendants other than David, however, may be said to satisfy the test by their alleged participation in the Estate's operation or management, despite not having an official position within it, is less clear. *See Reves*, 507 U.S. at 184; *see also First Capital Asset Mgmt., Inc.*, 385 F.3d at 178 ("[O]utsiders, like all other people, will be liable under RICO . . . if their actions satisfy

---

[13] We refer to the association-in-fact consisting of David and Larry as the "Estate," to distinguish it from the purported association-in-fact consisting of the six defendants discussed above.

the operation or management test.") (alteration omitted). While the "operation or management" test presents a "relatively low hurdle for plaintiffs to clear, . . . especially at the pleading stage," RICO plaintiffs must plausibly allege that each defendant played "*some* part in directing the enterprise's affairs" if the RICO claim is to survive a motion to dismiss. *First Capital Asset Mgmt.*, 385 F.3d at 176 (internal citations and alterations omitted).

In *First Capital Asset Management*, we explained that a RICO plaintiff adequately pleaded that a defendant parent had participated in the operation or management of the defendant's son's bankruptcy estate, despite not having a formal position within that estate. *Id.* at 178. The defendant had aided her debtor son in defrauding the Bankruptcy Court in various material ways that adversely affected the administration of the bankruptcy estate: for example, she accepted his transfer of assets to her (so that the money would not be included in his bankruptcy estate), sent him monthly payments from those fraudulently transferred assets, and made various false statements and misrepresentations to the Bankruptcy Court. *Id.* at 177-78. Based on these actions, we concluded that the defendant parent "participated in the conduct of the affairs" of the enterprise sufficient to sustain section 1962(c) liability, *id.* at 178, treating the bankruptcy estate as the enterprise. (That we ultimately affirmed dismissal of the claim based on the plaintiff's failure sufficiently to plead a pattern of racketeering acts lessens the precedential force of this conclusion, it is true, but we nonetheless find the *First Capital Asset Management* court's detailed analysis persuasive for present purposes.)

The same analysis applies to the remaining defendants here. The individual defendants (Mary Lou, Garvey, and Vitti) are alleged to have actively assisted David

when he operated the Estate to effectuate his schemes, which directly affected his management of the Estate. Although the entity defendants (Silver Knot and Red Knot) were used simply to effectuate David's schemes, they also can be understood to have sufficiently assisted David in his conduct of the Estate's affairs simply by their formation and existence: they were necessary tools for the schemes' operation. Such assistance may fairly be considered "participation" in the operation or management of an enterprise, at least in the circumstances alleged here.[14]

We bear in mind that the "operation or management" test is "essentially one of fact." *Id.* at 176. Accordingly, at this early pleading stage in the suit, we conclude that Virginia's allegations suffice to support her claim that each Defendant participated in the operation or management of the Estate as enterprise, in violation of section 1962(c). Thus, Virginia has sufficiently stated a civil RICO claim against all Defendants arising out of their alleged violation of section 1962(c). Our legal conclusions as to the adequacy of the Complaint's pleadings of the theories under sections 1962(b) and (c) reanimate Virginia's RICO conspiracy theory under section 1962(d), as well.

---

[14] Section 1962(c) prohibits *both* "conduct[ing]" an enterprise's affairs and "participat[ing]" in the conduct of an enterprise's affairs, while section 1962(b) prohibition centers on "acquir[ing] or maintain[ing] . . . control of any enterprise." Although Virginia has not pleaded that Mary Lou, Vitti, or Silver Knot "acquire[d] or maintain[ed]" control over the Estate for section 1962(b) purposes, *see* Part III, above, we conclude that her allegations are sufficient to make out a claim that those defendants "participate[d]" in the conduct of the Estate's affairs under section 1962(c). We identify an important difference between the two.

**CONCLUSION**

For the reasons stated above, we conclude that Virginia has adequately pleaded a RICO claim under 18 U.S.C. § 1964(c), and that her claim is ripe insofar as she seeks damages in the amount of the collection expenses that she has incurred through the filing of the Complaint. Whether she will be entitled to collect those expenses from Defendants, of course, will depend on whether she is able to prove her claims. Because Virginia pleaded a cognizable federal RICO claim, we also conclude that the District Court on remand should revisit the question whether to exercise supplemental jurisdiction over Virginia's state law claims.

We therefore VACATE the District Court's judgment and REMAND the cause for further proceedings in the District Court.