# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

---

AUGUST TERM 2022
No. 21-2105

VIRGINIA A. D'ADDARIO, INDIVIDUALLY AND ON BEHALF OF THE
F. FRANCIS D'ADDARIO TESTAMENTARY TRUST AND THE VIRGINIA
D'ADDARIO TRUST; AND VIRGINIA A. D'ADDARIO, EXECUTRIX, AS
EXECUTRIX OF THE PROBATE ESTATE OF ANN T. D'ADDARIO,
DECEASED, AND ON BEHALF OF THE F. FRANCIS D'ADDARIO
TESTAMENTARY TRUST AND THE ANN T. D'ADDARIO MARITAL
TRUST,
*Plaintiff-Appellant,*

BRENT A. PLATT, TRUSTEE, AS TRUSTEE FOR THE VIRGINIA
D'ADDARIO SPRAY TRUST #1, THE VIRGINIA D'ADDARIO SPRAY
TRUST #2, AND THE VIRGINIA D'ADDARIO ACCUMULATION TRUST,
*Plaintiff,*

v.

DAVID D'ADDARIO, MARY LOU D'ADDARIO KENNEDY, GREGORY S.
GARVEY, RED KNOT ACQUISITIONS, LLC, SILVER KNOT, LLC, AND
NICHOLAS VITTI,
*Defendants-Appellees.*[*]

---

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

On Appeal from the United States District Court
for the District of Connecticut

_____

ARGUED: DECEMBER 8, 2022
DECIDED: JULY 24, 2023

_____

Before:    CARNEY, MENASHI, and ROBINSON, *Circuit Judges*.

Plaintiff-Appellant Virginia D'Addario appeals from the grant of a judgment on the pleadings that barred her claims brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* According to Virginia, Defendant-Appellant David D'Addario, her brother and executor of their father's probate estate, looted the assets of the estate with the assistance of other defendants. Virginia seeks damages for legal expenses that she incurred in seeking to remove David as executor. The district court held that Virginia's claims are barred by the Private Securities Litigation Reform Act of 1995, also known as the "RICO Amendment," which provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO]." 18 U.S.C. § 1964(c). We conclude that Virginia's claims are not barred by the RICO Amendment because the fraud she alleges is not "in the purchase or sale of securities." Accordingly, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

Judge Carney concurs in part and dissents in part in a separate opinion.

2

Edward C. Taiman, Jr., Sabia Taiman LLC, Hartford, CT, F. Dean Armstrong, Armstrong Law Firm PC, Frankfort, IL, *for Plaintiff-Appellant*.

BRIAN SPEARS, Spears Manning & Martini LLC, Southport, CT, *for Defendants-Appellees Gregory S. Garvey and Red Knot Acquisitions, LLC.*

Tony Miodonka, Benjamin M. Arrow, Finn Dixon & Herling LLP, Stamford, CT, *for Defendants-Appellees David D'Addario, Mary Lou D'Addario Kennedy, Silver Knot, LLC, and Nicholas Vitti*.

MENASHI, *Circuit Judge*:

Plaintiff-Appellant Virginia D'Addario appeals from a judgment of the United States District Court for the District of Connecticut granting the defendants' motion for judgment on the pleadings. *D'Addario v. D'Addario*, No. 16-CV-0099, 2021 WL 3400633 (D. Conn. Aug. 4, 2021).

Virginia brought claims, both individually and as the executrix of her mother's estate, under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, against her brother, David D'Addario; her sister, Mary Lou D'Addario Kennedy; Gregory Garvey; Nicholas Vitti; Red Knot Acquisitions, LLC; and Silver Knot, LLC. She alleged that David orchestrated a long-running scheme to "plunder, pillage and loot the over $162,000,000 in assets of his deceased father's probate estate." App'x 40; Second Amended Complaint ("SAC") ¶ 1, *D'Addario v. D'Addario*, No. 16-CV-0099

(D. Conn. Oct. 15, 2019), ECF. No. 73. The district court concluded that Virginia's RICO claims were barred by the Private Securities Litigation Reform Act of 1995—also known as the "RICO Amendment"—which provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO]." 18 U.S.C. § 1964(c).

We conclude that Virginia's claims are not barred by the RICO Amendment. Accordingly, we reverse the judgment of the district court and remand for further proceedings.

## BACKGROUND

In considering this appeal, we "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor" of the plaintiff, Virginia. *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010) (internal quotation marks omitted).

## I

Virginia's father, F. Francis D'Addario, controlled D'Addario Industries, a business enterprise with ventures in "environmental waste recycling and management, real estate, construction, building materials, professional sports, communications, and fuel oil." SAC ¶ 9. Francis died in an airplane crash in 1986 with a net worth of approximately $111 million. He was survived by his wife, Ann, and their five children, Virginia, Larry, Mary Lou, Lisa, and David.

Shortly after his death, Francis's will was filed for probate in the probate court of Trumbull, Connecticut. Francis had appointed his two sons, David and Larry—along with three non-family members— to be executors of his estate. His will provided that one half of his net

assets would go into a marital trust for the benefit of his wife and the other half into five separate trusts for the benefit of his five children in equal shares. The will and other estate-planning documents provided that if any of the five children predeceased the others while the estate remained open, the deceased child's interests would return to the estate for pro rata distribution to the remaining siblings.

Over three decades after Francis's death, the estate remains open in probate court, and assets have not been distributed to beneficiaries. According to Virginia, the assets have not been distributed because, since at least 1987, David has done "everything within his power to transfer the significant assets of the Estate for his personal financial benefit." SAC ¶ 20. Although he "owed fiduciary duties to [Virginia]" as an executor of the estate and as a trustee of various testamentary trusts, he "engaged in a continuing course of conduct" in breach of those duties in order to capture the assets of the estate for himself. SAC ¶ 102. Apart from transferring assets away from the estate, David has allegedly kept the estate open in order to deprive Virginia of her interest in the estate. He allegedly told Virginia, "I'm 15 years younger than you, I'll outlive you, and I can keep the Estate open until after you die." SAC ¶ 16.

The defendants include David D'Addario; his sister, Mary Lou D'Addario Kennedy; his business partner and alleged co-conspirator Gregory S. Garvey; Red Knot Acquisitions, a Connecticut limited liability company owned by Garvey but alleged to be the alter ego of David; Silver Knot, a Delaware limited liability company formed by David and Garvey to engage in a scheme described below; and Nicholas Vitti, David's personal financial advisor and confidant.

5

In effectuating his alleged long-term plan to transfer estate assets for his personal benefit, David "designed and implemented a number of schemes." SAC ¶ 27. We describe each in turn.

**A**

First, we recount the "Red Knot Forbearance Agreement" scheme. SAC at 17. In 1986, the estate owed approximately $25 million to three banks—Connecticut National Bank, Connecticut Bank and Trust Company, and People's Bank (collectively, the "Bank Group")—on account of loans extended to F. Francis D'Addario. Four years later, the Bank Group claimed that the estate was in default on these loans and sought the sale of estate assets to satisfy the obligations. The estate and the Bank Group entered into an agreement pursuant to which additional funds were loaned to the estate and the estate's executors would sell assets to settle the loans.

In 1992, the Bank Group filed an application for removal of the executors in the probate court due to the estate's failure to dispose of assets in a timely fashion. The Bank Group alleged that David and Larry, as executors of the estate, had conflicts of interest that impeded the settlement of the estate to the detriment of its creditors. With the help of "skilled counsel," however, David delayed a disposition by the probate court for over five years. SAC ¶ 54.

By 1997, the amount owed to the Bank Group had grown to over $48 million. Because of its own "inner turmoil" and "substantial financial difficulties," the Bank Group offered to extinguish the loan obligations and liens in exchange for a one-time cash payment of $4.75 million. SAC ¶ 55. According to the complaint, David falsely claimed that the estate could not produce the required funds. Instead, David and Gregory Garvey created an entity called Red Knot Acquisitions,

6

which purchased the Bank Group's secured loan position and entered into a forbearance agreement with the estate.

The forbearance agreement gave Red Knot a lien on virtually all the estate's assets. The agreement also provided that if David were ever removed as an executor, Red Knot would have "the immediate right to engage in collection efforts on the over $48,000,000 allegedly owed to Red Knot." SAC ¶ 60. The agreement contained a purchase option under which the estate could purchase the loan position at a variable price until January 7, 2003. In 2000, for example, the estate could have exercised the purchase option for approximately $800,000 and extinguished the debt owed to Red Knot. David did not exercise that option on behalf of the estate.

Allegedly, the true purpose of the forbearance agreement was to make it practically impossible to remove David as an executor. "Rather than operate as a mechanism for a legitimate secured creditor (purportedly, Red Knot) and a debtor (the Estate) to extend and work out a debtor's defaulted loan obligations, here the Red Knot Forbearance Agreement was used by David and Garvey as a mechanism for David to stay in control of the Estate for as long as he desired." SAC ¶ 65.

**B**

Second, we recount the "Silver Knot/Wise Metals" scheme. SAC at 28. In 1986, shortly before his death, F. Francis D'Addario had been negotiating an investment in an aluminum can recycling business known as New England Redemption. After Francis's death, David "usurped that business opportunity for his personal financial benefit" rather than continue the negotiations on behalf of the estate. SAC ¶ 80. David "offered free rent in the Estate's Bridgeport Brass

7

Building [to New England Redemption] in exchange for a 25% ownership interest in the venture" for himself. SAC ¶ 80. Upon the sale of New England Redemption in 1994, David "converted the profits ... for his personal financial benefit[] and refused to plow those profits back into the Estate." SAC ¶ 81.

In 1999, David used those proceeds—or possibly other estate assets—to form Silver Knot, LLC, which acquired a controlling interest in Wise Metals, a producer of aluminum cans.[1] In 2014, Constellium N.V., a Dutch aluminum company, acquired Wise Metals for $1.4 billion, including a cash payment to Silver Knot of $455 million. David again did not deliver the proceeds of that sale to the estate. Instead, he "converted those sale proceeds for his personal financial gain and for the benefit of his co-conspirator Defendants." SAC ¶ 84.

## C

Third, we recount the schemes that allegedly involved the wrongful disposition of the estate's real property. In 1986, the estate owned an undeveloped plot of land on "Honeyspot Road" in Stratford, Connecticut. SAC ¶ 29. David failed to pay taxes on the land—even though the estate had sufficient "liquid assets" to pay its taxes—resulting in a delinquency and a foreclosure sale. SAC ¶ 33. The property was sold to "close friends" of Mary Lou in 1996 and then

---

[1] The district court said that David formed Silver Knot and acquired the interest in Wise Metals "using the proceeds from the New England Redemption sale." *D'Addario*, 2021 WL 3400633, at *2. But the complaint describes the source of the funds only as "assets, proceeds and business opportunities of the Estate." SAC ¶ 83.

sold back to an entity controlled by David in 1997 at below-market prices. SAC ¶ 34.

The estate also owned several residential properties in New York, California, Florida, and Vermont. For over a decade, David, Mary Lou, and Larry had "free and unfettered use" of the properties while the estate paid all the maintenance costs. SAC ¶ 76. In 1997, the New York and Vermont condominiums were deeded to David and the Vermont lot was deeded to Mary Lou without payment to the estate. In 1999, the California property was sold to a third party and David did not remit the proceeds from the sale to the estate.

Additionally, the estate owned a 50 percent interest in an undeveloped plot of land on "Frenchtown Road" in Trumbull, Connecticut. SAC ¶ 41. David knew that the town was interested in purchasing the property to build a new school. "In breach of his fiduciary duties, David did not take all reasonable steps necessary to accord the Estate the opportunity to acquire the [other] 50% interest" in the property. SAC ¶ 43. Instead, he purchased the remaining 50 percent interest through his own company for $450,000 and proceeded to sell the entire lot to the town for $6,000,000. Through the transaction, he earned $2.25 million in personal profit that should have reverted to the estate had he not usurped the business opportunity.

## II

In January 2016, Virginia sued the defendants in the United States District Court for the District of Connecticut. She asserted RICO claims—under 18 U.S.C. §§ 1962(b), 1962(c), and 1962(d)—and Connecticut state law claims related to David's breach of his fiduciary duties. Her RICO claims were predicated on acts of mail fraud, wire

9

fraud, money laundering, monetary transactions with unlawful proceeds, interstate racketeering, and interstate transport of misappropriated funds in connection with the fraudulent schemes discussed above.

The district court granted the defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), concluding that Virginia "fail[ed] to adequately plead substantive RICO violations, there is no diversity of parties, and the Court will not exercise supplemental jurisdiction over the state law claims." *D'Addario v. D'Addario*, No. 16-CV-0099, 2017 WL 1086772, at *1 (D. Conn. Mar. 22, 2017), *vacated and remanded*, 901 F.3d 80 (2d Cir. 2018).

On appeal, we vacated the district court's judgment and remanded for further proceedings. We concluded that Virginia had adequately pleaded a RICO claim under 18 U.S.C. § 1964(c) against all the defendants and adequately pleaded a RICO claim under 18 U.S.C. § 1962(b) against David, Garvey, and Red Knot. *D'Addario v. D'Addario*, 901 F.3d 80, 85-86 (2d Cir. 2018). While Virginia's claims based on her lost inheritance—and that of her mother's estate—were not ripe because the estate remained open and the amount of the lost inheritance was too speculative, her claim under RICO for legal expenses incurred in protecting her interest in the estate against David and other defendants was ripe. *Id.* at 95-96. We directed the district court to reconsider on remand whether to exercise supplemental jurisdiction over her remaining state law claims. *Id.* at 104-05.

On remand, the district court granted in part Virginia's motion for leave to file a second amended complaint and elected to exercise supplemental jurisdiction over her previously asserted state law

claims. Ruling on Plaintiff's Motion for Leave to File Second Amended Complaint at 13-14, *D'Addario v. D'Addario*, No. 16-CV-0099 (D. Conn. Sept. 23, 2019), ECF No. 69. However, Virginia subsequently moved to stay consideration of all state law claims or for the district court to decline to exercise supplemental jurisdiction over those claims pending resolution of the state law claims in an existing state court suit. The district court granted Virginia's motion and declined to exercise supplemental jurisdiction, dismissing those counts related to Connecticut state law claims for breach of fiduciary duties, aiding and abetting breach of fiduciary duties, conspiracy to breach fiduciary duties, and unjust enrichment. Ruling on Plaintiff's Motion to Stay or Decline Supplemental Jurisdiction at 10, *D'Addario v. D'Addario*, No. 16-CV-0099 (D. Conn. Apr. 3, 2020), ECF No. 88.

On September 4, 2020, the defendants filed a motion for judgment on the pleadings arguing that Virginia's RICO claims were barred by the RICO Amendment, which provides that "no person may rely upon conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO]." 18 U.S.C. § 1964(c); *see* Defendants' Motion for Judgment on the Pleadings, *D'Addario v. D'Addario*, No. 16-CV-0099 (D. Conn. Sept. 4, 2020), ECF No. 114. The district court granted the motion, concluding that the alleged fraudulent conduct described in the Red Knot and Silver Knot/Wise Metals schemes was actionable as securities fraud and therefore barred by the RICO Amendment. *D'Addario*, 2021 WL 3400633, at *6.

The district court explained that when a "scheme to defraud and the sale of securities coincide," such conduct is actionable as securities fraud and cannot form the basis of a RICO claim. *Id.* at *4 (quoting *SEC v. Zandford*, 535 U.S. 813, 822 (2002)). The district court

11

concluded that this case involved such conduct. Virginia alleged that David had granted a lien to Red Knot on the estate's assets—including securities—in exchange for a sham forbearance agreement that had the practical effect of making it impossible to remove him as executor. A pledge of securities is equivalent to a sale of securities for purposes of the securities fraud statutes. *See Rubin v. United States*, 449 U.S. 424, 425 (1981) ("[A] pledge of stock to a bank as collateral for a loan is an 'offer or sale' of a security."). Because the granting of the lien on estate securities coincided with the scheme to defraud, the district court held that the RICO Amendment applied and barred Virginia's claims.

The district court also concluded that the Silver Knot/Wise Metals scheme coincided with securities transactions because Virginia alleged that David converted estate assets in breach of his fiduciary duties through the purchase and sale of securities in New England Redemption, Silver Knot, and Wise Metals. *D'Addario*, 2021 WL 3400633, at *5. Based on these two schemes, the district court concluded that Virginia's RICO claims were barred and granted judgment on the pleadings in favor of the defendants. The district court did not separately address the alleged wrongful dispositions of real property. Virginia timely appealed.

## DISCUSSION

We review a district court's decision to grant a motion for judgment on the pleadings de novo. *Latner v. Mount Sinai Health Sys., Inc.*, 879 F.3d 52, 54 (2d Cir. 2018). We "accept all factual allegations in the complaint as true and draw all reasonable inferences in favor" of Virginia. *Bank of N.Y.*, 607 F.3d at 922 (internal quotation marks omitted).

**I**

RICO authorizes a cause of action against persons involved in a pattern of racketeering activity. *See* 18 U.S.C. § 1961(1) (defining "racketeering activity"). Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains." 18 U.S.C. § 1964(c). Section 1962 makes it unlawful to "acquire or maintain" an interest in or control of an enterprise through a pattern of racketeering activity, *id.* § 1962(b), to conduct or participate in the conduct of an enterprise through a pattern of racketeering activity, *id.* § 1962(c), and to conspire to do so, *id.* § 1962(d).

Congress amended the cause of action with the Private Securities Litigation Reform Act, Pub. L. No. 104-67, § 107, 109 Stat. 737 (1995). Before the amendment, a plaintiff could allege a civil RICO claim for securities fraud violations because "fraud in the sale of securities" is a predicate act of racketeering activity. 18 U.S.C. § 1961(1)(D); s*ee MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 274 (2d Cir. 2011). The amendment eliminated securities fraud as a basis for a civil RICO claim—at least in the absence of a criminal conviction—by providing that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c).[2]

The RICO Amendment aimed to avoid duplicative recoveries for securities fraud violations. "Because the securities laws generally

---

[2] *See generally* Eliza Clark Riffe, Note, *Actionability and Ambiguity: RICO After the Private Securities Litigation Reform Act*, 2012 U. Chi. Legal F. 463, 469-70 (2012).

provide adequate remedies for those injured by securities fraud, it is both [un]necessary and unfair to expose defendants in securities cases to the threat of treble damages and other extraordinary remedies provided by RICO." 141 Cong. Rec. H13, 691-08, at H13, 704 (daily ed. Nov. 28, 1995) (statement of SEC Chairman Arthur Levitt). The amendment sought to "prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of treble damages." *MLSMK*, 651 F.3d at 274.

The question presented in this case is whether claims arising from fraudulent conduct constituting a breach of fiduciary duties by the executor of an estate are barred by the RICO Amendment because the claims involve securities transactions. We conclude that for a claim to be barred, the fraud must be "*in* the purchase or sale of securities," which means that the actual purchase or sale of securities was fraudulent; it is not enough for securities to be an incidental feature of an overall scheme. 18 U.S.C. § 1964(c) (emphasis added). The Supreme Court has cautioned that securities fraud under section 10(b) of the Securities Exchange Act of 1934 "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation." *Zandford*, 535 U.S. at 820. The RICO Amendment also must not be construed so broadly as to bar RICO claims based on common law frauds that happen to involve securities.

Other circuits have reached the same conclusion. In *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, the Ninth Circuit held that a pledge of securities—as part of a tax scheme to generate the appearance of capital losses—was not fraud in the purchase or sale of securities for purposes of the RICO Amendment. 630 F.3d 866, 872 (9th Cir. 2010). While the defendant argued that the pledge of

securities coincided with the fraud, the court concluded that the tax "fraud bore an insufficient connection to the securities" and that "securities were merely a happenstance cog in the scheme." *Id.*

In *Ouwinga v. Benistar 419 Plan Servs., Inc.*, the Sixth Circuit decided that claims arising from a tax fraud effectuated through the purchase of life insurance policies were not barred by the RICO Amendment because the securities transactions "were not integral to ... the fraudulent scheme as a whole." 694 F.3d 783, 791 (6th Cir. 2012). The Sixth Circuit favorably cited a district court decision from our circuit with a similar holding. According to that decision, even when an "alleged [tax] fraud could not have occurred without the sale of securities at the inflated basis ... it is inaccurate to suggest that the actual purchase and sale of securities were fraudulent." *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 458 n.9 (S.D.N.Y. 2009). Rather, "the alleged fraud here involved a tax scheme, with the securities transactions only incidental to any underlying fraud." *Id.*

Similarly, in *Menzies v. Seyfarth Shaw LLP*, the Seventh Circuit held that the RICO Amendment does not bar claims arising from a tax shelter fraud effectuated through a series of securities transactions. 943 F.3d 328, 333-36 (7th Cir. 2019). In that case, the "complaint focused not on the ... stock sale, but instead on its tax consequences." *Id.* at 335. To show fraud in the purchase or sale of securities, the court explained, the plaintiff must have "incurred his alleged losses as a more direct consequence of misrepresentations that closely touched the stock sale itself and not just its tax consequences." *Id.*

We join these courts in holding that the RICO Amendment bars claims only when the alleged fraud is in the actual purchase or sale of securities, not when securities are incidental to the fraud.

**A**

Virginia alleged that David breached his fiduciary duty to the estate by arranging for his alter ego, Red Knot, to purchase the estate's debts in order to enhance his personal control over the estate. The transaction made Red Knot a secured creditor of the estate, with a lien on virtually all of the estate's assets. Those assets happened to include securities. Red Knot then entered into a forbearance agreement with the estate. But according to the complaint, the agreement was a sham because it provided that if David were ever removed as an executor, Red Knot would have "the immediate right to engage in collection efforts on the over $48,000,000 allegedly owed to Red Knot." SAC ¶ 60. The agreement had the practical effect of making it impossible to remove David as an executor of the estate. *See* SAC ¶¶ 59-65.

The alleged fraud was the use of an alter ego to purchase the estate's debts so that David could wield personal influence over the estate and the creation of the sham forbearance agreement that made David unremovable as an executor. That the estate owned securities was an incidental fact. Because the securities were merely "incidental to any underlying fraud," *Kottler*, 607 F. Supp. 2d at 458 n.9, there was no fraud "in the purchase or sale of securities," 18 U.S.C. § 1964(c).

**B**

Virginia also alleged a scheme in which David converted estate assets to his personal use. Since at least 1987, David has allegedly acted to "plunder, pillage and loot" the estate, SAC ¶ 28, and has done "everything within his power to transfer the significant assets of the Estate for his personal financial benefit," SAC ¶ 20. He did so by using estate assets to acquire interests in two aluminum processing

16

companies, New England Redemption and Wise Metals, and then by converting proceeds from the sale of those interests.

In particular, the complaint alleged that David misappropriated a business opportunity that his father had been negotiating. Rather than continue negotiations on behalf of the estate, David "usurped that business opportunity for his personal financial benefit." SAC ¶ 80. This allegation does not describe fraud "in the purchase or sale of securities." 18 U.S.C. § 1964(c).

David proceeded to use an estate asset—rentable space in the estate's Bridgeport Brass Building—to acquire a 25 percent ownership interest in the New England Redemption venture. Eight years later, he "converted the profits from the sale of [the venture] for his personal financial benefit, and refused to plow those profits back into the Estate." SAC ¶ 81.

David continued the conversion scheme through the formation of Silver Knot and the purchase and sale of Wise Metals. Again, David allegedly used "assets, proceeds and business opportunities" of the estate to capitalize Silver Knot, which would acquire a controlling interest in Wise Metals. SAC ¶ 83. After the sale of Wise Metals, David again did not deliver the proceeds of that sale to the estate but "converted those sale proceeds for his personal financial gain and for the benefit of his co-conspirator Defendants." SAC ¶ 84.

While securities transactions occurred with the purchase and sale of interests in New England Redemption and Wise Metals, securities were incidental to the multi-year conversion scheme. Virginia does not allege that David made misrepresentations about the value of securities or that he was not authorized to transact in securities on behalf of the estate. The alleged fraud was the

17

misappropriation and conversion of estate assets in violation of fiduciary duties to the estate. That is not fraud "in the purchase or sale of securities." 18 U.S.C. § 1964(c).[3]

## II

The district court concluded that Virginia's RICO claims were barred because the alleged misconduct described in the Red Knot and Silver Knot/Wise Metals schemes was actionable as securities fraud under *SEC v. Zandford*. In *Zandford*, the Supreme Court concluded that

---

[3] The partial dissent argues that "[u]nlike the Red Knot forbearance scheme, the securities transactions underlying the alleged Silver Knot/Wise Metals scheme were fraudulent in and of themselves." *Post* at 4. We disagree. Of the Red Knot scheme, the partial dissent explains that "although the scheme involved a pledge by the Estate of collateral that included securities," a securities transaction, "nothing about the Estate's pledge of securities was fraudulent":

> Virginia does not allege, for example, that David made any misrepresentations about the value of the securities pledged or that those securities could not lawfully be pledged as collateral. What made the Red Knot scheme fraudulent was instead that David was on both sides of the forbearance agreement and that he allegedly did not make a good faith effort to repay the Estate's debt.

*Id.* at 3. A similar argument applies to the Silver Knot/Wise Metals scheme. The complaint does not allege that David misrepresented the value of the securities or that the securities could not lawfully be purchased and sold. Instead, the Silver Knot/Wise Metals scheme was fraudulent because David did not act in good faith as executor but instead converted the estate's assets for his and the other defendants' benefit. In describing the fraud this way, we do not seek to describe the scheme at a "high level without referencing securities." *Id.* at 14. Rather, we recognize that an executor's breach of fiduciary duties to an estate is distinct from a fraudulent purchase or sale of securities.

18

a stockbroker's conduct—selling client securities held in a brokerage account and converting the proceeds to his own personal use—constituted fraud "in connection with" the purchase or sale of securities under section 10(b) of the Securities Exchange Act. Even though the stockbroker was authorized to engage in securities transactions on behalf of the client, the sales were "properly viewed as a course of business that operated as a fraud or deceit on [the] stockbroker's customer." *Zandford*, 535 U.S. at 821 (internal quotation marks omitted). In such circumstances, "[i]t is enough that the scheme to defraud and the sale of securities coincide." *Id.* at 822.

But the holding in *Zandford* "does not transform every breach of fiduciary duty into a federal securities violation." *Id.* at 825 n.4. The Court cautioned that section 10(b) "must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation." *Id.* at 820. For example, a case in which "a thief simply invested the proceeds of a routine conversion in the stock market" would not involve securities fraud. *Id.* For the fraud to "coincide" with a securities transaction, a claim must "necessarily allege," "necessarily involve," or necessarily "rest on" the purchase or sale of securities. *Romano v. Kazocos*, 609 F.3d 512, 522 (2d Cir. 2010) (quoting *Dabit v. Merrill Lynch, Fenner & Smith, Inc.*, 395 F.3d 25, 48, 50 (2d Cir. 2005)).

The *Zandford* Court emphasized the "threat to investor confidence in the securities industry" that results from stockbrokers misappropriating client assets from discretionary brokerage accounts:

> Not only does such a fraud prevent investors from
> trusting that their brokers are executing transactions for

19

their benefit, but it undermines the value of a discretionary account like that held by the [victims]. The benefit of a discretionary account is that it enables individuals, like the [victims], who lack the time, capacity, or know-how to supervise investment decisions, to delegate authority to a broker who will make decisions in their best interests without prior approval. If such individuals cannot rely on a broker to exercise that discretion for their benefit, then the account loses its added value.

*Zandford*, 535 U.S. at 822-23. The stockbroker's fiduciary duty to his client was to execute securities transactions in the client's best interest. For that reason, the securities transactions were a necessary feature of the fraud.

By contrast, an executor of a decedent's estate bears responsibility for the estate's administration. The executor is generally responsible for gathering estate assets, paying expenses and claims, filing tax returns, making distributions under the terms of the decedent's will, and maintaining records concerning management of the estate. The executor owes a duty of loyalty to beneficiaries and must avoid self-dealing. "No principle is more equitable or better settled in the law than that a trustee shall make no personal profit from the funds entrusted to his care beyond a reasonable compensation for his services." *Candee v. Skinner*, 40 Conn. 464, 468 (1873).

The Red Knot and Silver Knot/Wise Metals schemes involve alleged fraudulent conduct in breach of an executor's duty of loyalty to an estate. David purportedly engaged in self-dealing by purchasing the estate's debt in order to enhance his personal control over the estate. He made personal profits through the

20

misappropriation of estate assets. These fraudulent schemes only incidentally involved securities, unlike a securities broker who sells client securities in breach of his duty to execute securities transactions in the best interests of the client.[4]

## CONCLUSION

For the reasons stated above, we conclude that the alleged conduct was not fraud "in the purchase or sale of securities" and that Virginia's claims are not barred by the RICO Amendment. 18 U.S.C § 1964(c). We reverse the judgment of the district court and remand for further proceedings.

---

[4] Because we conclude that the RICO Amendment does not bar Virginia's claims even as to the Red Knot and Silver Knot/Wise Metals schemes, we need not separately address the district court's decision to issue a judgment on the pleadings as to the real property schemes that did not involve securities.

CARNEY, *Circuit Judge*, concurring in part and dissenting in part:

This Nutmegger family feud comes before this Court for the second time.[1] Virginia D'Addario ("Virginia") alleges that her younger brother, David D'Addario ("David"), has orchestrated a sprawling, decades-long scheme to "plunder, pillage and loot" the estate of their late father, F. Francis "Hi Ho" D'Addario ("Francis"). Second Amended Complaint ("SAC") ¶ 1. Francis, a prominent and successful Connecticut businessman, died in an airplane crash in March 1986; his estate (the "Estate") remains open in Connecticut's probate court system to this day, close to forty years later. Virginia alleges that David has chronically mismanaged the Estate and that he has abused his role as an Executor of the Estate by fraudulently cementing himself in that role, misappropriating the Estate's assets and opportunities for his own gain, and plotting to keep the Estate open until Virginia's death (at which point her share will devolve to the Estate and be divided equally among her surviving siblings). Virginia alleges that all Defendants—David; Mary Lou D'Addario Kennedy (David and Virginia's sister); Gregory Garvey; Nicholas Vitti; Red Knot Acquisitions, LLC; and Silver Knot, LLC—participated in at least some part of this scheme to defraud the Estate.[2]

---

[1] The "Nutmegger" nickname for Connecticut residents derives from the story that, in the State's early days, "traders from the north shore of the Sound were not above selling ostensible nutmegs that, upon close examination, proved to have been carved out of wood." José A. Cabranes, *Notes on the History of the Federal Court of Connecticut*, 57 CONN. BAR J. 351, 352–53 (1983).

[2] As the Majority recognizes, we review the district court's grant of judgment on the pleadings de novo, accepting all of the SAC's factual allegations as true and drawing all reasonable inferences in Virginia's favor. *See Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010).

In light of this Court's decision in the first appeal and the proceedings on remand, the only claim remaining in this lawsuit is Virginia's claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, for the substantial legal expenses she incurred, before first filing this suit, in opposing David's alleged mismanagement of the Estate and in seeking to unseat him as an Executor.[3]

The question presented in this appeal is whether Virginia's claim for recovery of those expenses is barred by section 107 of the Private Securities Litigation Reform Act of 1995, commonly referred to as the "RICO Amendment" because it amended the RICO statute. Section 107 provides in relevant part: "[N]o person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of [RICO]." 18 U.S.C. § 1964(c). The district court (Arterton, *J.*) concluded that Virginia's RICO claim was barred by the RICO Amendment and granted Defendants' motion for judgment on the pleadings with respect to Virginia's

_____

[3] In the first appeal, this Court vacated the district court's dismissal of Virginia's complaint under Fed. R. Civ. P. 12(b)(6). We concluded that:

> (1) Virginia's claim for distribution of her inheritance and that of her mother's estate [was] not ripe under RICO because the Estate [was] not closed and the amount of the lost inheritance [was] too speculative; (2) her claim under RICO for legal expenses incurred in pursuing her grievances against David and other defendants [was] ripe; (3) she ha[d] plausibly alleged that her legal expense injuries were proximately caused by Defendants' RICO violations; (4) she ha[d] adequately pleaded that David, Garvey, and Red Knot violated 18 U.S.C. § 1962(b); and (5) she ha[d] adequately pleaded that all six defendants violated 18 U.S.C. § 1962(c).

*D'Addario v. D'Addario*, 901 F.3d 80, 85–86 (2d Cir. 2018). We also directed the district court to reconsider its decision not to exercise supplemental jurisdiction over Virginia's state law claims. *Id.* at 105. On remand, having decided that she preferred to pursue her state law claims in state court, Virginia moved the district court to decline supplemental jurisdiction over those claims. The court granted that motion, leaving Virginia's RICO claim for legal expenses as the only surviving claim in this action. Dist. Ct. Dkt. 88. The record before us does not reflect the current status of her state law claims.

claim for legal expenses. *See D'Addario v. D'Addario*, No. 16-cv-99, 2021 WL 3400633, at *6 (D. Conn. Aug. 4, 2021). Virginia now appeals.

I fully agree with the Majority that the Red Knot forbearance scheme does not allege conduct that would be actionable as securities fraud and thus does not trigger the RICO Amendment.[4] Although the Red Knot scheme—as alleged—was certainly fraudulent, and although the scheme involved a pledge by the Estate of collateral that included securities, nothing about the Estate's pledge of securities was fraudulent: Virginia does not allege, for example, that David made any misrepresentations about the value of the securities pledged or that those securities could not lawfully be pledged as collateral. What made the Red Knot scheme fraudulent was instead that David was on both sides of the forbearance agreement and that he allegedly did not make a good faith effort to repay the Estate's debt. Rather, he let the debt balloon and used the threat of foreclosure to secure his role as Executor. Therefore, I concur with the Majority's ruling that the fraud alleged in the Red Knot forbearance scheme was not "*in* the purchase or sale of securities," 18 U.S.C. § 1964(c) (emphasis added); to use the term adopted by the Supreme Court in *S.E.C. v. Zandford* and examined further below, the fraud did not "coincide" with the purchase or sale of securities. 535 U.S. 813, 822 (2002).

---

[4] As the reader may recall, in 1997, the Estate owed over $48 million to three banks (the "Bank Group"). The Red Knot forbearance scheme alleges that Red Knot Acquisitions, LLC ("Red Knot")—a company that was created at David's instance and functioned as his "alter-ego"— purchased the Bank Group's loan position for $4,875,000. SAC ¶¶ 59, 61. Red Knot then entered into a forbearance agreement with the Estate that gave Red Knot a lien on "virtually all" of the Estate's assets and provided that, if David was ever removed as an Executor of the Estate, Red Knot would have the "immediate right" to collect on the Estate's debt and foreclose on its assets. SAC ¶ 60. The SAC alleges that this forbearance agreement is a "sham" that has operated to secure David's role as Executor against all potential challenges, allowing him to mismanage and pillage the Estate with impunity. SAC ¶ 62. *See generally* Maj. Op. at 6–7.

3

The alleged Red Knot scheme thus does not preclude Virginia from pursuing her claim for legal expenses under RICO.

I also agree with the Majority that a civil RICO claim predicated on allegations of fraud is not barred by the RICO Amendment simply because the alleged fraud somehow involves securities; instead, as the text of the RICO Amendment makes clear, the bar applies only when the fraud is "*in* the purchase or sale of securities," 18 U.S.C. § 1964(c) (emphasis added), that is, when "the actual purchase or sale of securities [is] fraudulent," Maj. Op. at 14.

I respectfully disagree with the Majority, however, with regard to how this requirement applies to the conduct alleged in the Silver Knot/Wise Metals scheme. In my view, this alleged scheme turns on fraud in the purchase or sale of securities—and thus triggers the RICO Amendment—because David committed the underlying fraud when, using Estate assets, he purchased securities for personal gain and in breach of his fiduciary duty. Unlike the Red Knot forbearance scheme, the securities transactions underlying the alleged Silver Knot/Wise Metals scheme were fraudulent in and of themselves. Accordingly, the fraud alleged in the Silver Knot/Wise Metals scheme "coincided" with the purchase of securities. *Zandford*, 535 U.S. at 820.

The Majority conceives of the alleged Silver Knot/Wise Metals scheme as a "multi-year conversion scheme" involving "the misappropriation and conversion of [E]state assets in violation of fiduciary duties to the [E]state." Maj. Op. at 18. But by defining the Silver Knot/Wise Metals scheme at such a high level of generality, the Majority overlooks the fact that, in this scheme, David allegedly misappropriated Estate assets *through the purchase of securities*. As alleged, David committed fraud when he purchased securities for his own gain using Estate assets. Because this alleged fraud was "in the purchase or sale of securities," 18 U.S.C. § 1964(c), the Silver Knot/Wise Metals scheme triggers the RICO Amendment.

4

I therefore respectfully dissent from the Majority's holding insofar as it concerns the Silver Knot/Wise Metals scheme. I would hold that Virginia's RICO claim, at least as it relates to that scheme, is barred by the RICO Amendment. Accordingly, I would: reverse the district court's judgment with respect to the Red Knot forbearance scheme; affirm with respect to the Silver Knot/Wise Metals scheme; and remand to allow the district court to determine in the first instance whether Virginia can pursue her RICO claim for legal expenses, exclusive of allegations concerning the Silver Knot/Wise Metals scheme.[5]

## BACKGROUND

### I.     The RICO Amendment, Section 10(b), and Rule 10b-5

A civil RICO claim is barred by the RICO Amendment if the plaintiff alleges "conduct that would have been actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c). To determine whether a plaintiff has alleged conduct that satisfies this description, courts have looked to section 10(b) of the Securities Exchange Act of

---

[5] Some courts have opined that, when a civil RICO claim is based on one overarching fraudulent scheme, even one securities fraud allegation is sufficient to bar the entire claim. *See, e.g.*, *Gilmore v. Gilmore*, No. 09-cv-6230, 2011 WL 3874880, at *6 (S.D.N.Y. Sept. 1, 2011), *reconsideration denied*, 2011 WL 5517832 (S.D.N.Y. Nov. 10, 2011), *aff'd*, 503 F. App'x 97 (2d Cir. 2012) (summary order); *Great W. Ins. Co. v. Graham*, No. 18-cv-6249, 2020 WL 3415026, at *37 (S.D.N.Y. June 22, 2020); *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 650–51 (S.D.N.Y. 2017). In this case, however, the Silver Knot/Wise Metals scheme was a discrete part of the sprawling and multi-faceted fraudulent pattern of behavior alleged in the SAC. Indeed, to the extent that any particular scheme alleged in the SAC can be said to underpin Virginia's entire RICO claim, that would be the Red Knot forbearance scheme, which is the vehicle through which David maintained control over the Estate, enabling Defendants to carry out most (if not all) of the other, subsidiary schemes alleged in the SAC. Our Panel is unanimous that the Red Knot forbearance scheme does not rest on allegations of securities fraud. Accordingly, in my view, it is unclear whether the Silver Knot/Wise Metals scheme can be disentangled from the overarching scheme to defraud alleged in the SAC such that the remainder of Virginia's claim can survive the RICO Amendment bar. I would remand for the district court to make this determination in the first instance, with the assistance of briefing from the parties.

5

1934 and Rule 10b-5, which the Securities and Exchange Commission ("SEC") promulgated pursuant to its authority under section 10(b). *See* Maj. Op. at 14–15, 20; *D'Addario*, 2021 WL 3400633, at \*4; *see also, e.g.*, *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 334 (7th Cir. 2019); *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 871 (9th Cir. 2010); *Bixler v. Foster*, 596 F.3d 751, 759–60 (10th Cir. 2010).[6]

Section 10(b) makes it unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . .[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." 15 U.S.C. § 78j(b). Rule 10b-5, in turn, makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5;[7] *see also S.E.C. v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016) ("Section 10(b) of the Exchange Act and Rule 10b-5 . . . are violated if a person has (1) made a

---

[6] As discussed further below, section 10(b) and Rule 10b-5 provide the natural starting point for determining whether conduct would be actionable as securities fraud. *See Zohar*, 286 F. Supp. 3d at 644 ("To best define what constitutes conduct actionable as fraud in the purchase or sale of securities, courts have consulted an obvious source in Section 10(b) of the Securities Exchange Act of 1934, which—while not identical to the language of the RICO Amendment—covers a broad range of securities fraud."). Tying the scope of the RICO Amendment to the scope of section 10(b) and Rule 10b-5 is also consistent with the legislative purpose of the RICO Amendment: "to prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases." *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 274 (2d Cir. 2011) (internal quotation marks omitted).

[7] "Rule 10b–5 is coextensive with the coverage of § 10(b) . . . ." *Zandford*, 535 U.S. at 816 n.1.

material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." (internal quotation marks omitted)).

## II.    The Silver Knot/Wise Metals Scheme

As the Majority's description indicates, the "Silver Knot/Wise Metals scheme" is something of a misnomer: although the parties refer to the "scheme" in the singular (a practice I adopt in this dissent), the scheme in fact consists of two distinct sets of fraudulent securities transactions.

As to the first, Virginia alleges that shortly before his death in 1986, Francis had been negotiating to acquire a 50% ownership interest in an aluminum can recycling business called New England Redemption. After Francis died, David did not advance these negotiations on behalf of the Estate; rather, he "usurped that business opportunity for his personal financial benefit" by personally acquiring shares representing a 25% interest in New England Redemption. SAC ¶ 80. In exchange for the shares, David provided the company "free rent" in the Bridgeport Brass Building, a property belonging to the Estate. *Id.* After New England Redemption was sold for a "multi-million[-]dollar profit" in 1994, David "converted" his share of those profits "for his personal financial benefit, and refused to plow [them] back into the Estate." SAC ¶ 81.

The second set of transactions began in 1999, when, at David's direction, David's attorney created Defendant Silver Knot, LLC for the purpose of acquiring a controlling interest in Wise Metals, a company that produced aluminum can stock. The SAC alleges that David controlled Silver Knot. In 2001, David used "assets, proceeds and business opportunities of the Estate to acquire a controlling interest in Wise Metals through Silver Knot, which interest equitably belonged to the Estate." SAC ¶ 83. After Silver Knot (and with it, Wise Metals) was acquired in 2014 for $1.4 billion, David again

7

"converted [the] sale proceeds for his personal financial gain" and refused to plow them back into the Estate. SAC ¶ 84.

Thus, as described above, the Silver Knot/Wise Metals scheme (itself a relatively small part of David's decades-long looting of the Estate) consists of two alleged frauds. In each, David used Estate assets to purchase securities in his own name or in the name of a company he controlled. When those securities were sold, David pocketed the proceeds. Accordingly, in the alleged Silver Knot/Wise Metals scheme, securities transactions are the vehicle by which David defrauded the Estate.

## DISCUSSION

The RICO Amendment has been construed to incorporate the definition of securities fraud established by section 10(b) and Rule 10b-5. *See, e.g.*, *Menzies*, 943 F.3d at 334; *Rezner*, 630 F.3d at 871. Whether the Silver Knot/Wise Metals scheme triggers the RICO Amendment thus turns on whether that scheme includes allegations of fraud "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). I believe that it does. The scheme includes fraud because, by investing Estate assets for purely personal gain, David breached his fiduciary duty to the Estate's beneficiaries. David committed this fraud "in connection with" the purchase or sale of securities because he carried it out through the purchase of stock—first, in New England Redemption, and second, in Wise Metals.

In concluding otherwise, I fear that the Majority has adopted an unduly cramped construction of the RICO Amendment that is at odds with the Amendment's language and purpose. By focusing on an overly high-level description of the Silver Knot/Wise Metals scheme, the Majority fails to recognize that this scheme was allegedly carried out through stock purchases that were fraudulent in and of themselves. And by focusing on the nature of David's fiduciary duty instead of the nature of the alleged fraudulent

8

transactions, the Majority limits the reach of the RICO Amendment in a way that is inconsistent with the Supreme Court's historically broad construction of section 10(b) and Rule 10b-5—a construction that should apply with equal force to the RICO Amendment.

**I.     The Silver Knot/Wise Metals scheme alleges a fraudulent scheme, act, or course of business.**

The Majority appears to agree with me that, in carrying out the alleged Silver Knot/Wise Metals scheme, David committed fraud. *See* Maj. Op. at 18, 21 (discussing the "alleged fraud" and the "alleged fraudulent conduct" underlying the Silver Knot/Wise Metals scheme).

Subsections (a) and (c) of Rule 10b-5 make it unlawful to "employ any device, scheme, or artifice to defraud," or to engage in any fraudulent "act, practice, or course of business," "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(a), (c). The Supreme Court has explained that section 10(b)—and thus Rule 10b-5—should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *Zandford*, 535 U.S. at 819 (internal quotation marks omitted). In this spirit, courts and the SEC alike have interpreted subsections (a) and (c) of Rule 10b-5 broadly to prohibit all sorts of fraudulent conduct—so long as the fraud is carried out "in connection with" the purchase or sale of a security. *See, e.g.*, *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1101–02 (2019) (explaining that subsections (a) and (c) of Rule 10b-5 contain "expansive" language that "capture[s] a wide range of conduct"); *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 10 n.7 (1971) ("[Section] 10(b) and Rule 10b-5 prohibit all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or

present a unique form of deception." (quoting *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 397 (2d Cir. 1967))).[8]

Here, it is undisputed that David, as an Executor of the Estate, owed a fiduciary duty to the Estate's beneficiaries, including Virginia. *See* Maj. Op. at 14, 21; *see also Hall v. Schoenwetter*, 686 A.2d 980, 983 (Conn. 1996) ("[A]n executrix must remain loyal to the estate that she is administering and must not act out of self-interest or for the interests of parties other than the heirs, distributees, and creditors of the estate."); *Geremia v. Geremia*, 125 A.3d 549, 571 (Conn. App. Ct. 2015) ("The administrator or executor . . . has a fiduciary duty to bargain for the rights of all decedent's beneficiaries and to turn over to them their appropriate share of any proceeds." (internal quotation marks omitted)).

In the Silver Knot/Wise Metals scheme, as described above, David allegedly used Estate assets to purchase stock for his own personal gain—first in New England Redemption, and then in Wise Metals. In other words, David used property and money that belonged to the Estate to make investments on his own behalf rather than on behalf of the Estate. David thereby breached his fiduciary duty to the Estate's beneficiaries. *See* Maj. Op. at 21 ("No principle is more equitable or better settled in the law than that a trustee shall make no personal profit from the funds entrusted to his care beyond a reasonable compensation for his services." (quoting *Candee v. Skinner*, 40 Conn. 464, 468 (1873))).

---

[8] *See also* Leonard B. Sand, et al., 4 *Modern Federal Jury Instructions: Civil*, Instruction 82–4 (2023) ("A device, scheme, or artifice to defraud is merely a plan for the accomplishment of any objective. Fraud is a general term that embraces all ingenious efforts and means that individuals devise to take advantage of others."); *United States v. Treacy*, No. S2 08-cr-366, 2008 WL 4934051, at *4 (S.D.N.Y. Nov. 19, 2008) (same), *reconsideration granted on other grounds*, 2009 WL 47496 (S.D.N.Y. Jan. 8, 2009); *United States v. Bongiorno*, No. 05-cr-390, 2006 WL 1140864, at *5 (S.D.N.Y. May 1, 2006) (same).

This conduct satisfies the "fraud" component of section 10(b) and Rule 10b-5: in carrying out the alleged Silver Knot/Wise Metals scheme, David abused his position as Executor to take advantage of the Estate's beneficiaries, who were entitled to trust that any transactions involving Estate assets would be made for their benefit. In the language of Rule 10b-5, David engaged in a fraudulent "scheme," "act," or "course of business." 17 C.F.R. § 240.10b-5(a), (c).

## II. The fraud alleged in the Silver Knot/Wise Metals scheme was committed in connection with the purchase of securities.

The critical question, then, is whether the fraud alleged in the Silver Knot/Wise Metals scheme was committed "*in connection with* the purchase or sale of any security." 15 U.S.C. § 78j(b) (emphasis added). In answering this question in the affirmative, I part ways with the Majority.

In *Zandford*, the Supreme Court explained that section 10(b)'s "in connection with" requirement is satisfied when "the scheme to defraud and the sale of securities coincide." 535 U.S. at 822.[9] In that case, the SEC alleged that a stockbroker sold his customers' securities without the customers' knowledge or consent and misappropriated the proceeds of those sales, taking them for his own benefit. *See id.* at 815, 825. The Court concluded that the broker's alleged fraud was committed "in connection with" the sale of securities because "each sale [of securities] was made to further [the broker's] fraudulent scheme; [and] each was deceptive because it was

---

[9] Although *Zandford* did not involve the RICO Amendment, courts applying the RICO Amendment have looked to *Zandford* for guidance in determining whether the fraud at issue was committed "in connection with" the purchase or sale of securities. *See, e.g.*, *Menzies*, 943 F.3d at 334–35; *Zohar*, 286 F. Supp. 3d at 644; *see also* Maj. Op. at 14–15, 19–21. This approach makes good sense because, as explained above, courts have understood the RICO Amendment to incorporate the definition of securities fraud established by section 10(b) and Rule 10b-5, including the "in connection with" requirement the Supreme Court construed in *Zandford*.

11

neither authorized by, nor disclosed to, the [customers]. . . . Indeed, each time [the broker] exercised his power of disposition [of the stock] for his own benefit, that conduct, without more, was a fraud." *Id.* at 820–21 (internal quotation marks omitted).

In my view, the fraud alleged in the Silver Knot/Wise Metals scheme satisfies the standard set out in *Zandford*. When David purchased stock in New England Redemption on his own behalf in exchange for allowing the company to occupy space in the Estate's Bridgeport Brass Building, he breached his fiduciary duty to act in the best interest of the Estate's beneficiaries. David thereby committed fraud (again, assuming the truth of the allegations).[10] Likewise, David's purchase—through Silver Knot—of Wise Metals stock was fraudulent because the purchase was made for David's personal financial benefit even though it was funded with Estate assets.[11] These

---

[10] The Majority concludes that David's purchase of New England Redemption stock was not fraudulent and that it does not trigger the RICO Amendment. Virginia makes no such argument on appeal. Indeed, neither of Virginia's appellate briefs even mentions New England Redemption. This at least raises the possibility that, as Appellant, Virginia has waived any argument that the purchase of New England Redemption stock does not trigger the RICO Amendment. *See LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir. 1995); Fed. R. App. P. 28(a)(8)(A) (appellant's brief must include contentions and reasons). The Majority nonetheless reaches the merits of this issue and rules in Virginia's favor. I therefore address the merits of this issue as well.

[11] The SAC charges that David, acting through his controlled entity, Silver Knot, used Estate assets to acquire a controlling interest in Wise Metals in 2001. The SAC also asserts, however, that Silver Knot initially held this interest "in trust for the benefit of the Estate" and that therefore the "original holding of the Estate's interest in Wise Metals . . . was not *per se* wrongful." SAC ¶ 85. Virginia alleges that David's possession (through Silver Knot) of the Wise Metals stock did not become wrongful until October 2014, when Silver Knot was sold and David refused to pay those sale proceeds into the Estate. SAC ¶¶ 82–83, 85. The SAC's legal conclusion regarding when David's possession of the Wise Metals stock became wrongful is not entitled to any weight. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, Virginia cannot avoid the RICO Amendment bar by strategically choosing not to allege that David acted with fraudulent intent when he first purchased the Wise Metals stock. *See MLSMK*, 651 F.3d at 274; *cf. Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999) ("Allowing such

12

securities transactions were part and parcel of David's scheme to misappropriate Estate assets for his own gain; the stock purchases and the alleged fraud "were not independent events." *Id.* at 820. Accordingly, David's breach of his fiduciary duty—the alleged fraud underlying the Silver Knot/Wise Metals scheme—"coincided" with the purchase of securities. *Id.*

The Silver Knot/Wise Metals scheme resembles the alleged scheme that was found to trigger the RICO Amendment in *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634 (S.D.N.Y. 2017). In that case, several entities (collectively, "Zohar") alleged that the defendants "engaged in a wide-ranging conspiracy to enrich themselves by pillaging Zohar's funds and impairing its assets, ultimately rendering it unable to repay investors." *Id.* at 638. In particular, Zohar alleged that the defendants, who created Zohar and managed its investments, used Zohar's funds to acquire equity on their own behalf rather than on behalf of Zohar and its noteholders. *See id.* at 648–49. In a careful and detailed opinion, Judge Pauley concluded that this scheme presented "a clear example in which a breach of fiduciary duty and a securities transaction coincide," and therefore that Zohar's RICO claim was barred by the RICO Amendment. *Id.* at 649, 651.

The allegations here are comparable: David, as an Executor of the Estate, was authorized to invest the Estate's assets and had a duty to act in the interest of the Estate's beneficiaries. But David abused this position of trust by using Estate assets to make investments for his own gain alone. Because securities transactions are the means

---

surgical presentation of the cause of action . . . would undermine the congressional intent behind the RICO Amendment."). In any event, the facts alleged by the SAC—especially when viewed in the context of David's alleged ongoing decades-long scheme to loot the Estate—do not plausibly suggest that David secretly (and lawfully) held the Wise Metals shares in his controlled entity's name for the benefit of the Estate, only to change his mind and develop a fraudulent intent after the sale was completed and the proceeds received.

by which David breached his fiduciary duty, his fraudulent conduct coincided with the purchase of securities. The RICO Amendment therefore applies.

III.     **David's stock purchases cannot be separated from the alleged fraud underlying the Silver Knot/Wise Metals scheme.**

The Majority decides that the alleged fraud underlying the Silver Knot/Wise Metals scheme did not occur "in," or "in connection with," the purchase or sale of securities. To reach this conclusion, the Majority attempts to drive a wedge between the alleged fraud and David's purchases of stock in New England Redemption and Wise Metals. The Majority endeavors to separate the alleged fraud from the stock purchases by defining the fraud at the highest possible level of generality: the fraud, in the Majority's telling, was a "multi-year conversion scheme" involving "the misappropriation and conversion of [E]state assets in violation of fiduciary duties to the [E]state." Maj. Op. at 18; *see also id.* at 18 n.3 ("[T]he Silver Knot/Wise Metals scheme was fraudulent because David did not act in good faith as executor but instead converted the [E]state's assets for his and the other defendants' benefit."). Because the Silver Knot/Wise Metals scheme can be described at this high level without referencing securities, the Majority concludes that David's stock purchases were only "incidental" to the alleged fraud. *Id.* at 18.

But nowhere does the Majority explain why David's alleged stock purchases were not fraudulent in and of themselves. In my view, no such explanation exists: as discussed above, David made these purchases for his own personal benefit using Estate assets in breach of his fiduciary duty. The stock purchases were fraudulent standing alone; they are the vehicle through which David executed the alleged fraud. To use the Majority's framing, the stock purchases are *how* David "misappropriat[ed] and conver[ted] . . . [E]state assets in violation of fiduciary duties." *Id.* Accordingly, the

14

Majority errs in concluding that the stock purchases were merely incidental to the Silver Knot/Wise Metals scheme. They were essential to it.

To be sure, the Majority is correct that the Silver Knot/Wise Metals scheme "does not allege that David made misrepresentations about the value of securities or that he was not authorized to transact in securities on behalf of the [E]state." *Id.* But these are not the only ways for a securities transaction to be fraudulent. Securities fraud need not involve a misrepresentation about a security's value. *See* 17 C.F.R. § 240.10b-5(a), (c); *Zandford*, 535 U.S. at 820; *Frohling*, 851 F.3d at 136. And, as *Zandford* illustrates, a fiduciary who is generally authorized to trade securities on another's behalf can nonetheless commit securities fraud by engaging in unauthorized securities transactions for the fiduciary's own benefit. *See* 535 U.S. at 820–21. That is exactly what is alleged here. Although David was "authorized to transact in securities on behalf of the [E]state," Maj. Op. at 18, he was *not* authorized to use Estate assets to purchase securities in his own name and for his own benefit. That is why the Silver Knot/Wise Metals scheme alleges securities fraud.

## IV.    The tax fraud precedents on which the Majority relies are distinguishable.

In concluding that the Silver Knot/Wise Metals scheme does not trigger the RICO Amendment, the Majority relies on precedents from our sister circuits (and from a district court in this Circuit) that construed the RICO Amendment as not erecting a bar to claims involving fraudulent tax shelters. In my view, these cases are distinguishable.

In each case, the plaintiffs alleged that the defendants sold them tax shelters that turned out to be fraudulent. Although the tax frauds involved securities—the frauds were committed using proceeds derived from securities transactions—the RICO Amendment did not bar the plaintiffs' RICO claims because nothing about the underlying securities transactions was fraudulent. *See Menzies*, 943 F.3d at 335–36 ("The

complaint all but says every aspect of the stock sale itself was entirely lawful. . . . The fraud Menzies alleged is at least one step removed—focused not on the sale of the . . . stock but on how and why he charted a particular course in his treatment of the sale for federal tax purposes and the losses he sustained by doing so."); *Rezner*, 630 F.3d at 872 ("Rezner's decision to use bonds had no effect on the fraudulent scheme, which instead concerned the tax treatment of a loan."); *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 791 (6th Cir. 2012) ("The Ouwingas . . . do not allege fraud relating to the purchase of [securities] by the [fraudulent welfare benefit plan]. . . . [T]heir fraud claim relates only to the tax consequences of the . . . [p]lan . . . ."); *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 457 n.9 (S.D.N.Y. 2009) ("[I]t is inaccurate to suggest that the actual purchase and sale of securities were fraudulent. In actuality, the securities performed exactly as planned and marketed; it was the overall [tax] scheme that allegedly defrauded the Plaintiffs . . . .").

The Silver Knot/Wise Metals scheme is unlike the frauds alleged in these cases. In all of these cases, the plaintiffs alleged that the defendants sold fraudulent tax shelters that were funded in part by proceeds derived from *lawful* securities transactions. In none of these cases was it alleged—as it is here—that the underlying securities transactions were fraudulent in and of themselves.[12]

---

[12] As the Majority points out, the above-cited decisions emphasized that the underlying securities transactions were only "incidental" to the alleged tax frauds. *Ouwinga*, 694 F.3d at 791; *see also Rezner*, 630 F.3d at 872 ("[T]he securities were merely a happenstance cog in the scheme."); *Menzies*, 943 F.3d at 335 (same). But the securities transactions in the foregoing cases were "incidental" to the fraudulent schemes only insofar as the securities transactions were not the specific aspects of the schemes that made the schemes fraudulent. In this case, by contrast, David's stock purchases are what made the Silver Knot/Wise Metals scheme fraudulent: the stock purchases are the means by which David breached his fiduciary duty to the Estate's beneficiaries.

16

The difference between the tax fraud cases and the Silver Knot/Wise Metals scheme is also highlighted by focusing on when the alleged frauds were consummated. In the tax fraud cases, the frauds were not consummated upon the occurrence of the underlying securities transactions.[13] Rather, the frauds were consummated later, when the plaintiffs deployed tax strategies that were found to be unlawful. *See Menzies*, 943 F.3d at 335–36; *Rezner*, 630 F.3d at 872; *Kottler*, 607 F. Supp. 2d at 457 n.9. In *Zandford*, by contrast, the stockbroker committed fraud each time he made an unauthorized sale of his clients' securities for his own benefit. 535 U.S. at 820–21. Likewise, in *Zohar*, the defendants committed fraud each time they used company funds to acquire equity for themselves. *See* 286 F. Supp. 3d at 649.

So too here in the Silver Knot/Wise Metals scheme: immediately upon using Estate assets to purchase stock in New England Redemption for his own gain, David had committed fraud; the same is true with respect to the purchase of Wise Metals stock. No further act was necessary to complete the fraud.[14] The fraud was therefore

---

[13] If a scheme becomes fraudulent upon the occurrence of a securities transaction, then the securities transaction is what made the scheme fraudulent, and the "in connection with" requirement is satisfied. *Cf. Zandford*, 535 U.S. at 825 ("[T]he fraud was not complete before the sale of securities occurred."). If, on the other hand, a fraud is consummated sometime before or after a securities transaction and through some other means, then the "in connection with" requirement is not satisfied, and the RICO Amendment does not apply. *Cf. Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984) (Friendly, J.) ("[Section 10(b) and Rule 10b-5] impose liability for a proscribed act in connection with the purchase or sale of a security; it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part.").

[14] This is not to say that the alleged fraudulent scheme ended after David's stock purchases. The SAC alleges that, after David's interests in New England Redemption and Wise Metals were sold, David misappropriated the proceeds of those sales for his own benefit. SAC ¶¶ 81, 84. But the SAC would allege securities fraud even if David had not misappropriated the sale proceeds. *See Zandford*, 535 U.S. at 822 ("The fact that respondent misappropriated the proceeds of the sales provides persuasive evidence that he had violated § 10(b) when he made the sales, but misappropriation is not an essential element of the offense.").

"in," and "in connection with," the purchase of securities. 18 U.S.C. § 1964(c); 15 U.S.C. § 78j(b).

**V.    The "in connection with" inquiry focuses on how the alleged fraud was carried out, not on the type of duty breached by the fraudster.**

As discussed, the Majority concludes that the stock purchases underlying the Silver Knot/Wise Metals scheme were merely "incidental" to the alleged fraud. Maj. Op. at 18. The Majority contrasts this scheme with the fraud alleged in *Zandford* by focusing on the nature of the stockbroker's duty to his clients and by distinguishing that duty from the one David owed to the Estate's beneficiaries. *See* Maj. Op. at 20–21. In my view, the Majority's approach misapprehends the focus of the "in connection with" inquiry in a way that unduly limits the reach of the RICO Amendment.

*First*, the Majority states that the nature of the broker-client relationship is what made the securities transactions in *Zandford* a "necessary" rather than an "incidental" feature of the fraud. Maj. Op. at 18, 21. I believe this interpretation of *Zandford* is incorrect.

In that case, as described above, the stockbroker's alleged fraud was "in connection with" the sale of securities because each individual sale of securities was unauthorized by the broker's clients and was made for the broker's own benefit. *See* 535 U.S. at 820–21. Nonetheless, in explaining why its holding would not "transform every breach of fiduciary duty into a federal securities violation," the Court provided hypothetical situations demonstrating that the stockbroker *could have* defrauded his clients without transacting in securities. The Court stated that such a fraud would not have violated section 10(b): "If, for example, a broker embezzles cash from a client's account or takes advantage of the fiduciary relationship to induce his client into a fraudulent real estate transaction, then the fraud would not include the requisite connection to a purchase or sale of securities." *Id.* at 825 n.4.

18

These hypotheticals illustrate that, even though the broker's relationship with his clients inherently involved securities, not *every* fraud committed by the broker against his clients would have been "in connection with" the purchase or sale of securities. In other words, where the alleged fraud is a breach of fiduciary duty, the "in connection with" inquiry focuses on the nature of the fraudulent *transaction*, not on the nature of the duty breached by the fraudster. Thus, in this case, it is immaterial that David's fiduciary duty to the Estate's beneficiaries did not necessarily involve trading in securities. Virginia alleges that the Silver Knot/Wise Metals scheme was carried out through fraudulent stock purchases. That is what counts in the RICO Amendment inquiry.

*Second*, the Majority emphasizes that, because the fraud in *Zandford* constituted the abuse of a stockbroker-client relationship, that fraud posed a "threat to investor confidence in the securities industry." Maj. Op. at 20 (quoting *Zandford*, 535 U.S. at 822). This is, of course, a valid observation: the Silver Knot/Wise Metals scheme does not appear to implicate investor confidence in the securities industry, and David's fiduciary duty, as discussed, arose not in the investment context but rather from his role as Executor of his father's Estate.

The application of section 10(b) and Rule 10b-5 is not limited, however, to frauds that implicate the integrity of the securities markets. *See Zandford*, 535 U.S. at 821–22 ("Although we recognized [in *Bankers Life*] that the interest in 'preserving the integrity of the securities markets' was one of the purposes animating the statute, we rejected the notion that § 10(b) is limited to serving that objective alone." (quoting 404 U.S. at 12)). Thus, section 10(b) applies to face-to-face securities frauds as well as those committed on a stock exchange, *id.*; and section 10(b) applies to transactions in stock issued by small or closely held corporations just as it applies to transactions in stock issued by large, publicly traded companies, *see Overton v. Todman & Co., CPAs, P.C.*, 478 F.3d 479,

19

488 (2d Cir. 2007); *Sulkow v. Crosstown Apparel Inc.*, 807 F.2d 33, 37 (2d Cir. 1986). As the Supreme Court has repeatedly instructed, section 10(b) is to be "construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972) (quoting *S.E.C. v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 195 (1963)); *see also Zandford*, 535 U.S. at 821; *Bankers Life*, 404 U.S. at 12. This same principle should apply in determining what constitutes actionable securities fraud for purposes of the RICO Amendment.

Accordingly, although David is not a stockbroker, the fact remains that he exposed himself to charges of securities fraud when he used Estate assets to purchase securities for his own gain. *See Bankers Life*, 404 U.S. at 12 ("Since there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under [section] 10(b) . . . ."); *id.* at 10 n.7 ("Novel or atypical methods should not provide immunity from the securities laws." (quoting *A.T. Brod & Co.*, 375 F.2d at 397)). The Silver Knot/Wise Metals scheme therefore triggers the RICO Amendment.

One final point bears mentioning. Given the unique nature of the frauds alleged by Virginia and their nexus to ongoing probate matters, we all might agree that— notwithstanding the alleged securities law breach—the SEC is unlikely to bring an enforcement action against David. But the RICO Amendment is worded broadly and tells us that the bar applies whenever the alleged conduct "would have been actionable" as securities fraud. 18 U.S.C. § 1964(c). Reading that language literally, and expansively, is appropriate and consistent with the Amendment's purpose: "to prevent litigants from using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of treble damages." *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 651 F.3d 268, 274 (2d Cir. 2011) (internal quotation marks omitted). Therefore, in applying the RICO Amendment, courts should be concerned only with whether the SEC *could* bring

an enforcement action on the alleged facts; the decision whether to bring such an action is committed to the agency.

## CONCLUSION

The Silver Knot/Wise Metals scheme turns on allegations that David breached his fiduciary duty to the Estate's beneficiaries through the purchase of securities. I believe that this conduct would have been actionable as securities fraud, and that therefore the RICO Amendment applies—at least with respect to this scheme. Accordingly, I would: reverse the district court's judgment with respect to the Red Knot forbearance scheme; affirm with respect to the Silver Knot/Wise Metals scheme; and remand for the district court to determine in the first instance whether Virginia can pursue her RICO claim for legal expenses without relying on allegations concerning the Silver Knot/Wise Metals scheme. For the foregoing reasons, and with respect, I concur in part and dissent in part.